## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MIKAEL GIDADA,** | ) |
| | ) |
| **JUANITA GIDADA,** | ) |
| | ) |
| **AYANE GIDADA,** | ) |
| | ) |
| **DAVID GIDADA,** | ) |
| | ) |
| **JOHN GIDADA,** | ) |
| | ) **Case No. 1:21cv2338** |
| **LILU GIDADA,** | ) |
| | ) |
| **SANDRA LOLI,** | ) |
| | ) |
| **RICHARD ALAN BONI,** | ) **JURY TRIAL DEMANDED** |
| | ) |
| **RICHARD ABDULLAH BONI,** | ) |
| | ) |
| **LISA MITCHELL,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **CATHERINE ANDERSON,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **ISLAMIC REPUBLIC OF IRAN** | ) |
| **Serve: Foreign Minister Hossein Amirabdollahian** | ) |
|     **Ministry of Foreign Affairs** | ) |
|     **Khomeini Avenue** | ) |
|     **United Nations Street** | ) |
|     **Tehran, Iran** | ) |
| | ) |
| **Defendant.** | ) |

## COMPLAINT

NOW COME the Plaintiffs, MIKAEL GIDADA, JUANITA GIDADA, AYANE

GIDADA, DAVID GIDADA, JOHN GIDADA, LILU GIDADA, SANDRA LOLI, RICHARD

ALAN BONI, RICHARD ABDULLAH BONI, LISA MITCHELL, and CATHERINE
ANDERSON (collectively referred to herein as "Plaintiffs"), by counsel, bring this action
seeking damages arising out of the hostage taking and torture of Mikael Gidada ("Mike") and
Sandra Loli ("Sam") in Yemen at the hands of *Ansar Allah*, more commonly known as the
Houthis. Mike, Sam, and their immediate families (collectively referred to herein as "Plaintiffs"),
move for judgment against the Islamic Republic of Iran, its Ministries, Agencies, and
Instrumentalities (collectively referred to herein as "Iran" or "Defendant"), for its role in
providing material support to the Houthis, and in support thereof alleges as follows:

I.     **THE PARTIES**

1.     Plaintiff Mike was abducted by the Houthis on April 30, 2018, tortured, and held
for eight hundred and ninety-nine days. He is domiciled in the Commonwealth of Virginia.

2.     Plaintiff Juanita Gidada is the mother of Mike and is domiciled in the
Commonwealth of Virginia.

3.     Plaintiff Ayane Gidada is the sister of Mike and is domiciled in the State of
California.

4.     Plaintiff David Gidada is the brother of Mike and is domiciled in the State of
California.

5.     Plaintiff John Gidada is the brother of Mike and is domiciled in the
Commonwealth of Virginia.

6.     Plaintiff Lilu Gidada is the sister of Mike and is domiciled in the State of Georgia.

7.     Plaintiff Sam was abducted by the Houthis on June 11, 2019, tortured, and held
for 491 days. She is domiciled in the State of New York.

8.     Plaintiff Richard Alan Boni is the husband of Sam and is domiciled in the State of New York.

9.     Plaintiff Richard Abdullah Boni is the son of Sam and is domiciled in the State of New York.

10.    Plaintiff Lisa Mitchell is the sister of Sam and is domiciled in the State of New Jersey.

11.    Plaintiff Catherine Anderson is the sister of Sam and is domiciled in the State of Vermont.

12.    Defendant Iran is a foreign state. Since January 19, 1984, Iran has been designated as a state sponsor of international terrorism pursuant to Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b).

## II.    JURISDICTION AND VENUE

13.    Jurisdiction over the subject matter of this case arises under 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2), 1367, and 1605A.

14.    Despite its status as a foreign state, Iran is subject to suit in the courts of the United States pursuant to the Foreign Sovereign Immunities Act, as amended, specifically 28 U.S.C. § 1605A, due to Iran's longstanding designation as a "State Sponsor of Terrorism."

15.    The hostage taking and torture of Mike and Sam occurred at the direction of and/or with the material support of Iran, and, as a direct and intentional result of those hostage takings, harmful effects occurred within the territory of the United States.

16.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(f)(4).

17.     At all times relevant to this case, Plaintiffs were citizens of the United States of America and have remained so to the present day.

## III.   NATURE OF THE ACTION

18.     Iran has long served as a benefactor of the Houthis. Iran leverages this relationship to advance its goal of expanding its influence in Yemen by fostering political instability and pressuring American policy leaders, while simultaneously lifting a proxy organization to power on the southern border of its bitter rival, Saudi Arabia.

19.     By knowingly and intentionally providing material support and resources to enable and assist the Houthis in carrying out acts of terrorism against Americans, Iran is liable for the damages suffered by Plaintiffs as a direct and proximate result of the hostage taking and torture of Mike and Sam.

## IV.   FACTUAL ALLEGATIONS

### A.     Background on the Conflict in Yemen

20.     The Houthis are the modern manifestation of a Yemeni rebel group known as *Ansar Allah* (meaning the "Partisans of God") that adheres to a branch of Shia Islam known as Zaidism.

21.     In 2004, a Zaidi leader named Hussein al-Houthi was killed by the Yemeni government. His death sparked renewed fervor amongst his followers and swelled the military ranks of the rebellion that would then take his name.

22.     The Houthis official slogan, borrowed directly from Iran, is "God is great, Death to America, Death to Israel, God curse the Jews, Victory to Islam."

23.     In 2011, in the midst of the Arab Spring movement, long-time Yemeni President Ali Abdullah Saleh ("Saleh") was driven out of power. In an internationally brokered transition,

Saleh was replaced by Abdu Rabbu Mansur Hadi ("Hadi"). The Hadi government was supported by the United Nations, Saudi Arabia, and by the United States of America.

24.     On November 27, 2013, the United Nations Security Council issued a public statement praising the Hadi government's "progress made to date in Yemen's ongoing political transition process" and its "efforts to reconstruct the economy and safeguard security."

25.     President Barack Obama hailed the installation and support of the Hadi government as a successful step in America's foreign policy efforts "to degrade and ultimately destroy the terrorist group known as ISIL."

26.     On August 29, 2014, the United Nations Security Council condemned the Houthis for obstructing peaceful political transition in Yemen. Two days later, the Houthis announced their intention to escalate their campaign to bring down the Hadi government.

27.     In September 2014, the Houthis forcefully entered Yemen's capital city of Sana'a as unrest and violence became more prevalent throughout the country.

28.     In a November 1, 2014 letter submitted to the United Nations, the United States requested sanctions against Saleh and two Houthi military leaders based upon "attempts to cause chaos throughout Yemen" by seeking "not only delegitimize the central government, but also create enough instability to stage a coup."

29.     By January 2015, the Houthis had succeeded in overthrowing the Hadi government and had placed Hadi under house arrest.

30.     In February 2015, Hadi fled to the port city of Aden, the former capital of South Yemen, and began to amass regional support for continuing the civil war against the Houthis. Most notably, Hadi successfully obtained the military support of Saudi Arabia. This conflict continues to the present day.

31.     On September 26, 2015, the Yemeni Coalition to Monitor Human Rights Violations issued a report alleging human rights abuses carried out by the Houthis between September 21, 2014 and August 15, 2015, including but not limited to:

a.     At least three soldiers being killed after their arrest but while inside public hospitals, and reports of others being abducted immediately upon their release;

b.     The random shelling of residential areas within cities;

c.     Over three thousand civilian deaths and more than seven thousand wounded, including over eight hundred women and children;

d.     Over five thousand cases of arbitrary detention, with suspicion of using these prisoners as human shields at military sites that may be targeted by airstrikes;

e.     Nearly one thousand cases of forced disappearance;

f.     At least two hundred fifteen abductions or forced disappearances of children and two involving individuals with special needs;

g.     The death of eleven detainees as a result of using them as human shields during airstrikes; and

h.     Three documented cases of death resulting from torture.

32.     Between May 2016 and April 2020, the Houthis were documented to be responsible for "904 incidents of arbitrary or abusive detention, 353 incidents of enforced disappearance, and 138 incidents of torture, including 27 deaths in detention centers."

**B.     Iran's Material Support of the Houthis**

33.     Due to a long history of providing financial and military support to terrorist organizations, Iran is officially designated as a state sponsor of international terrorism within the meaning of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), and the Foreign Assistance Act of 1961, 22 U.S.C. § 2371(b).

34.     In accordance with its explicit foreign policy goals, Iran regularly supports, enables, and assists other foreign states, organizations, terrorist groups, and rebel forces in destabilizing governments that are friendly to the United States, Israel, and/or Saudi Arabia.

35.     The main instrumentality that Iran uses to pursue these goals is the Iranian Revolutionary Guard Corps ("IRGC") and its subsidiary the Qods Force ("IRGC-QF"). These entities further extend Iran's reach through their influence and command over international organizations such as Hezbollah.

36.     Hussein al-Houthi, the namesake of the movement, established his relationship with Iran by traveling to Tehran as early as 1986.

37.     A 2015 United Nations' report found that "[c]urrent military Iranian support to Houthis in Yemen is consistent with patterns of arms transfers going back to more than five years to date." A number of paragraphs in that report highlight specific events composing that pattern of activity, but these are clearly only the tip of the iceberg as successful clandestine arms transfers, by definition, go undetected.

38.     Since at least 2009, the Iranian Martyrs Foundation, a fund overseen by Iran, has provided significant financial support to the Yemen Martyrs Foundation, a Houthi organization.

39.     In April 2009, the crew of an unnamed Iranian vessel loaded crates of weapons onto Yemeni boats in international waters, intended for use by the Houthis.

40.     In October 2009, the Yemeni government seized an Iranian ship loaded with anti-tank weapons in the Red Sea. Six crew members on board were identified as weapons experts sent to replace other Iranian weapons experts that had been injured while fighting alongside the Houthis.

41.     Beginning in 2011, the IRGC-QF assigned one of its key members, Abdul Reza Shahlai, to lead Iran's efforts to advise, assist, resource, and train the Houthis.

42.     In February 2011, an Iranian fishing vessel was seized by Yemeni authorities while carrying 900 Iranian-made anti-tank and anti-helicopter rockets intended for the Houthis.

43.     As of 2012, a Hezbollah operative named Khalil Harb was responsible for Hezbollah's ongoing activities in Yemen to support the Houthis, including financial support of at least $50,000 per month.

44.     In 2013, Yemeni authorities seized an Iranian ship, the "Jihan," in the act of carrying military-grade weapons to the Houthis.

45.     In 2014, an unnamed senior Iranian official stated that the IRGC-QF "had a 'few hundred' military personnel in Yemen to train Houthi fighters."

46.     On March 10, 2014, Israeli forces seized an Iranian vessel off the Eritrean coast carrying arms intended for the Houthis. Iran has utilized Eritrean islands in the Red Sea to provide military training to Houthi soldiers and to store weapons for later use by the Houthis.

47.     In September 2014, a representative within the Iranian parliament stated that "[t]hree Arab capitals have today ended up in the hands of Iran" and concluded that Sana'a, Yemen, was in the process of becoming the fourth to join "the Islamic Iranian revolution" that is a key part of the "grand jihad." He further stated that success in Yemen will allow Iranian influence to "extend, following [the Houthis'] success, into Saudi territories. The Yemeni-Saudi vast borders will help accelerate [Iran's] reach into the depths of Saudi land."

48.     In October 2014, members of Hezbollah's 3800 Unit were captured in Yemen while training the Houthis. Leaders of Hezbollah have confirmed training the Houthis in Yemen, Lebanon, and within Iran.

49.     In January 2015, a representative of Iran's Supreme Leader Ali Khamenei referred to the Houthis as "a similar copy to Lebanon's Hezbollah" and stated that Iran "directly supports the Houthis in Yemen, Hezbollah in Lebanon, the popular forces in Syria and Iraq." He also confirmed that Iranian officials "have reiterated this many times."

50.     In an April 8, 2015 interview, then United States Secretary of State John Kerry confirmed that Iran was providing material support to the Houthis. "[T]here are obviously supplies that have been coming from Iran. There are a number of flights every single week that have been flying in. And we trace those flights, and we know this. We are well aware of the support that Iran has been giving to Yemen."

51.     On September 26, 2015, the United States Navy confiscated weapons and military equipment from an Iranian fishing boat off the coast of Oman that was reported to be destined for delivery to the Houthis.

52.     Late in 2016, a small remotely piloted speed boat, loaded with explosives, was seized in the Strait of Hormuz, off the coast of Yemen. Similar boats were being successfully deployed in attacks against the Saudi Navy during that time. The computer on board this boat was analyzed, and found to have Iranian-made hardware. Moreover, images were discovered saved on the computer appearing to show the facility where it was made. One of the men pictured possessed a hat bearing the IRGC logo.

53.     On February 26, 2017, the Houthis deployed four unmanned aerial vehicles ("UAVs"), which they have named the Qasef-1 and claim to have designed and manufactured themselves. The Houthis have since utilized many of these UAVs in attacks against Saudi installations such as missile defense systems, shipping lines, airports, and oil facilities.

54.     The Houthis did not design or manufacture these UAVs. The Qasef-1 design is nearly identical to commonly recognized Iranian UAV designs. Moreover, multiple shipments of UAVs and their components have been intercepted in-route to Yemen since 2016.

55.     On November 20, 2017, IRGC-QF members were sanctioned by the US Treasury Department for participation in a large-scale counterfeiting scheme involving Yemeni bank notes. The purpose of this scheme was to raise money for the IRGC-QF's sponsorship of terrorism and to destabilize Yemen's economy in support of the Houthi rebellion.

56.     In a 2018 report, the United States Department of State found that roadside bombs in Yemen were similar to the bombs used by Hezbollah and Iran-linked insurgents in Iraq and Bahrain.

57.     More recently, while the support continues to flow, anll pretense regarding its existence or purpose has been discarded. Prominent billboards have been erected in Sana'a to honor Iranian leadership, including one honoring the death of IRGC-QF commander Qasem Soleimani. Houthi leaders have publicly identified themselves as part of Iran's "axis of resistance" in the region.

58.     Brigadier General Abolfazl Shekarchi, a spokesperson for the Iranian military, was quoted in September 2020 as claiming that "we provided them (Yemenis) with the experiences in technology in the defense sphere."

59.     On October 17, 2020, Iran sent an ambassador to Yemen, publicly recognizing the legitimacy of the Houthi government.

60.     In addition to supplies and advisors sent into Yemen, Iran has brought groups of Houthi soldiers into military camps in southern Syria to gain combat experience. These programs

have trained thousands of Houthis with the goal of making them more effective fighters in the war against the Hadi government.

61.     The military training, strategic intelligence, and economic support provided to the Houthis by Iran was a direct and proximate cause of the military success of the Houthis, their ability to exert control in Sana'a, and their successful overthrow of the internationally recognized Hadi government.

62.     Once the Houthis maintained control over Sana'a, they were further encouraged, trained, and/or instructed by Iran and its proxies in the taking of American hostages as a means of obtaining leverage over the United States and Saudi Arabia.

63.     When selecting hostage taking victims, based on training provided by Iran, the Houthis specifically identified and prioritized American citizens as higher value, premium targets, allowing similarly situated citizens of other nations to go free.

64.     The Houthis routinely demanded financial compensation or prisoner releases in exchange for the surrender of American prisoners, often continuing to negotiate up until the moment the hostage was released. The hope of receiving such ransom rewards was a key motivation for taking hostages.

65.     Due to the actions alleged herein, and its status as a designated State Sponsor of Terrorism, Iran may be held responsible before this Court for the provision of material support that led to the Houthis' hostage taking and torture of Mike and Sam.

66.     Iranian support for the Houthis continues to the present day, evidenced by missiles, unmanned aircraft, explosives, and small arms of Iranian origin that are regularly deployed by the Houthis.

67.     On August 7, 2019, this Court found Iran liable for the October 2015 hostage taking of John Hamen and Mark McAlister. *Hamen v. Islamic Republic of Iran*, No. 1:16cv1394, ECF No. 57 (D.D.C. Aug. 7, 2019).[1]

68.     In that matter, the Court was presented with "a litany of evidence that Iran has provided the Houthis with weaponry since at least 2009 . . . has provided financial assistance to the Houthis through Hezbollah . . . and has facilitated the Houthis' training." *Id.* at 26–27.

69.     The Court further held that Iran's support "was not only a 'substantial factor' but a necessary precondition to the Houthis kidnapping of McAlister and Hamen [and] . . . put the Houthis in a position of power to commit acts of terrorism like the ones at issue in this case." *Id.* at 28.

### C.     Hostage Taking and Torture of American Citizens

#### i.     *The Hostage Taking and Torture of Mikael Gidada*

70.     Mike first travelled to Yemen to pursue business opportunities in 2001. Over the next two decades, he operated a variety of businesses, including mining, export, and water bottling companies.

71.     When the Houthis took over the country in 2015, Mike was in Sana'a and was not able to freely travel because of fear for his safety. He stayed in Yemen, attempting to continue the successful operations of his business under the new regime.

---

[1] Plaintiffs hereby incorporate the factual testimony, expert witness testimony, and exhibits presented in *Hamen* within the allegations of this Complaint. Because of the similarity of this case to *Hamen*, Plaintiffs intend to ask this Court to take judicial notice of the factual record before Judge Moss in that matter. "Because of the number of individuals affected by terrorist attacks, and the associated 'flood of cases that they generate,' courts in this Circuit resolving FSIA cases have 'regularly' taken judicial notice of the record in related cases." *Barry v. Islamic Republic of Iran*, No. 1:16cv1625, 2019 WL 4194824, at *1 (D.D.C. Sept. 4, 2019) (quoting *Goldstein v. Islamic Republic of Iran*, No. 1:16cv2507, 2018 WL 6329452, at *2 (D.D.C. Dec. 4, 2018)). In this context, the district court may "rely upon the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010).

72.     In March 2018, Mike's business partner was assassinated by the Houthis. He intensified his efforts to leave the country, but was unable to find a viable alternative.

73.     On April 30, 2018, Houthi soldiers came to Mike's home to arrest him, without charges or formal process. He was blindfolded and handcuffed by hooded men with rifles. When he shouted for help, the men repeatedly struck him with their guns and forced him to comply with their demands.

74.     Mike was taken to what he understood to be the National Security Bureau building, a large detention facility operated by the Houthis. He was put into a small brightly lit cell and held there for the next 899 days. The bright light in the room was kept on at all times. A tiny window in the wall, above where he could reach, was the only way for him to tell whether it was day or night.

75.     Mike would be interrogated from time to time about who he was and why he was in Yemen. In all, he counted thirty-nine times that he was interrogated by his captors. Some would last only an hour, others as long as twelve hours. The interrogators always told him that he was going to die in prison unless he admitted to spying on behalf of America and Israel. Other times, his interrogators threatened to put him in a cell with members of al Qaeda or ISIS

76.     Under duress, Mike surrendered the passwords for his electronic devices and the Houthis confiscated all of his digital files and records. Many of his business records were stolen from him and never returned.

77.     Some of these interrogations would take place in what he describes as a conference room. On the wall of that room were portraits of Ayatollah Khamenei and IRGC-QF leader Qasem Soleimani.

78.     During some of the interrogations, Mike was forced to do hard physical exercises, such as squats, while lifting heavy objects and being whipped with an electrical wire. He was once forced to drink a gallon of water as quickly as possible right before one of these sessions.

79.     On other days, Mike was forced to stand outside all day, without shade, food, or water.

80.     Mike was allowed to use the bathroom three times each day, for about four minutes each time. Aside from these visits, he was forced to use a bucket or bottle in his cell if he needed to relieve himself. He was allowed to shower once every few months. His drinking water came exclusively from the bathroom faucet, which caused him to have stomach pain and digestive problems throughout his captivity.

81.     Throughout much of his 899 days as a hostage, Mike was kept in solitary confinement. As time went on, however, he occasionally had the opportunity to speak with some of his fellow detainees. One man he talked with told Mike that he had been detained because he was opposed to the expansion of Iranian influence over the Houthis.

82.     After 335 days of captivity, Mike was permitted to make his first phone call to his family, but the call was limited to three minutes. He did not receive a second brief phone call until the end of his second year. His third and final call was permitted approximately one month before he was released.

83.     On October 14, 2020, Mike was released into the custody of an Omani diplomatic delegation as part of a negotiated prisoner swap. 283 Houthi soldiers were freed and returned to Yemen several hours before his release.

84.     Upon his release, none of Mike's possessions were returned to him and he was blocked from accessing his local bank account. He soon learned that his businesses were

destroyed. Money and valuable gem stones he had left behind in his home were confiscated. His investments in mining sites throughout Yemen were inaccessible to him, rendered effectively worthless.

85.     Two months after his release, Mike suffered a stroke, and was diagnosed with diabetes and high blood pressure. These conditions came about as a result of his treatment in captivity at the hands of the Houthis. He also suffered from two hernias due to the hard exercises he was forced to perform.

86.     As of the filing of this case, Mike continues to struggle with various physical, mental, and emotional injuries caused by his 899 days as a hostage.

ii.     *The Hostage Taking and Torture of Sandra Loli*

87.     Sam first travelled to Yemen in January 1983 as a volunteer member of the Peace Corps. She lived there off and on until 2019, working with different internationally funded development programs to improve basic services such as water, health, and education.

88.     Beginning in 2014, Sam worked for the Silver Filter Company, a business owned by her husband and a Yemeni partner, managing the quality control of production and selling ceramic water filters throughout Yemen. She routinely travelled back and forth between Yemen and the United States for this business effort.

89.     When she left Yemen in May 2016, she was unable to return for several years because of a lack of commercial flights into Sana'a, where the company was based. Although she tried to work remotely, Sam needed to get back to Yemen because her job duties revolved around supervising quality control and meeting with clients.

90.     In early April 2019, Sam flew into Aden and traveled by car into Sana'a. She planned to be there until early June. The Houthis knew about the Silver Filter Company and were

aware that Sam and her husband were American citizens. She had been questioned by Houthi security officers before, shortly after their invasion in 2015, but was told the Houthis had no issue with them and authorized them to continue their work.

91.     Unfortunately, this visit did not go as planned. On June 11, 2019, Sam attempted to leave Sana'a for a trip back to the United States. As before, she had all of the necessary visas, permits, and travel documentation, approved both by the Houthis and by the Hadi government in Aden. She presented these papers to the Houthi soldiers at the checkpoint leaving Sana'a.

92.     Without explanation, Sam and her colleagues were abruptly forced to sit in the rear of their vehicle and two Houthi men got in the front and began to drive, claiming that the road was not safe and they had to be taken to a secured building instead. They demanded surrender of telephones and other personal property.

93.     The group soon arrived at a stone building inside a military camp. Sam was blindfolded, separated from her colleagues, and brought inside one of the small bunkers located below the building. Two men inspected her belongings. Later, two women came to complete an inventory of her suitcase. One of the men spoke to her in very good English, saying not to be afraid, that she was with the government, and that if she told them the truth she would be released soon.

94.     After they had finished going through all of her things, Sam was blindfolded again and brought back to the vehicle. A short drive later, the car stopped and she was led into another building. She was led up some stairs and down a hallway, then down a long stairway.

95.     She was brought to a room that was approximately thirteen by seventeen feet. The room contained a small floor cushion, a water bottle, and one very foul-smelling blanket. About one-quarter of the room was sectioned off by a plywood divider. On the other side of this divider

were two female guards. A fisheye peephole was installed in the plywood so the guards could

watch Sam, which they did often. Sam would remain in this room for four months, and would

not be released from Yemen for another year thereafter, a total of 491 days after she was first

taken hostage.

96.     During these first four months, Sam was not allowed to go outside even once. Her

cell had a small window high off the ground that let in a small bit of light and an occasional

breeze.

97.     Sam's use of the bathroom was limited. Whenever she left her cell, the guards

forced her to wear a large black dress over her clothes and a hijab. The door to the bathroom was

always left open. No toilet paper was provided to her, only a hose for washing. Sam quickly

developed a urinary tract infection that caused significant pain and other digestive problems.

98.     Sam was given a bucket to bathe and wash her clothes once a week at first, but as

time went on, this frequency was reduced. Her overall level of sanitation and hygiene was very

poor.  Initially, she began a regular exercise routine inside her room, but overtime she stopped

and just lay down most of the time. In her captive mind, perhaps if she allowed her health to

deteriorate it would be more likely that she would be released.

99.     Interrogations always happened late at night, often lasting three or more hours and

continuing into the early morning hours. These visits were used as psychological torture.

100.     During the initial interrogations, Sam was given paper and told that she could

write letters to her husband and family and that she would be given their replies. She learned

later that only one of those letters was ever delivered. Her interrogator once showed Sam pictures

from her son's high school graduation, forcing her to look at them so she knew what she was

missing. This same man gave her a book to read, but told her that it was about a dying man who reminded him of Sam.

101.     During interrogations, Sam was told that if she spoke honestly, she would be released. She was often given lengthy writing assignments to explain herself, her life, and why she was in Yemen. She always told the truth, but the Houthi interrogator was never satisfied.

102.     One day, Sam's interrogator was particularly angry. He yelled at her repeatedly, claiming that she was lying to protect people and was afraid of her government. He said things would get much worse for her if she did not cooperate. Over the subsequent weeks, her guards removed even more of her few comforts, restricting her diet and her bathroom privileges further.

103.     When the interrogator returned, about two months later, he said he had come to bring her to a place where "they knew how to get information out of people" and that she had one last chance to tell the truth. Sam told him she had been completely honest and could not tell him anything more. He had her blindfolded and bound, yelled at her some more, before finally ordering her to be taken to a vehicle outside.

104.     Contrary to the threat, the second prison was actually better than the first. One person told Sam it was a "transit station" and that from there she would go out. Sam believed that she would be released soon. Unfortunately, this was not entirely true, as months passed without word of release. In the meantime, a few more threatening interrogations took place, ultimately leaving Sam all the more demoralized and depressed.

105.     Finally, in June 2020, one year into her captivity and about eight months since moving to the second facility, two men came to the prison and allowed Sam to call her husband. After four more long months, on October 14, 2020, Sam was released from captivity and started her journey home.

106.     As of the filing of this case, Sam continues to struggle with various physical, mental, and emotional injuries caused by her 491 days as a hostage. These ailments include, but are not limited to, lower back pain, neuropathy in her feet, digestive issues, sleep disturbances, anxiety, and post-traumatic stress disorder.

## V.     CAUSES OF ACTION

### COUNT I – THE PROVISION OF MATERIAL SUPPORT FOR THE HOSTAGE TAKING & TORTURE OF MIKAEL GIDADA (28 U.S.C. § 1605A(c))

107.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

108.     At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

109.     Iran provided material support and resources to the Houthis for the purpose of supporting, enabling, advancing, and benefiting from the Houthis' successful military campaign against the internationally recognized Hadi government.

110.     As such, Iran's provision of material support and resources to the Houthis was and is intentional, wanton, and willful, with the explicit understanding that violence against Americans, such as Mike, is an expected and welcomed result of those actions.

111.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Mike was taken hostage and tortured by the Houthis.

112.      As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Mike endured severe pain and suffering.

113.     As a direct and proximate result of Defendant's actions, Juanita Gidada, Ayane Gidada, David Gidada, John Gidada, and Lilu Gidada have experienced significant solatium

damages including, but not limited to, severe mental and physical anguish, and the harm caused by the loss of Mike's society and comfort.

114.     Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Houthis, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

115.     Such conduct violates 28 U.S.C. § 1605A.

116.     A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

### COUNT II – THE PROVISION OF MATERIAL SUPPORT FOR THE HOSTAGE TAKING & TORTURE OF SANDRA LOLI (28 U.S.C. § 1605A(c))

117.     Plaintiffs repeat and re-allege each allegation of the foregoing paragraphs as if fully set forth herein.

118.     At the time of the events at issue, Iran was designated as a state sponsor of terrorism and remains so designated today.

119.     Iran provided material support and resources to the Houthis for the purpose of supporting, enabling, advancing, and benefiting from the Houthis' successful military campaign against the internationally recognized Hadi government.

120.     As such, Iran's provision of material support and resources to the Houthis was and is intentional, wanton, and willful, with the explicit understanding that violence against Americans, such as Sam, is an expected and welcomed result of those actions.

121.     As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Sam was taken hostage and tortured by the Houthis.

122.    As a direct and proximate result of Iran's willful, wrongful, and intentional acts, Sam endured severe pain and suffering.

123.    As a direct and proximate result of Defendant's actions, Richard Alan Boni, Richard Abdullah Boni, Lisa Mitchell, and Catherine Anderson have experienced significant solatium damages including, but not limited to, severe mental and physical anguish, and the harm caused by the loss of Sam's society and comfort.

124.    Iran's continuing provision of material support to those willing to commit murder, and other terrorist acts, such as the Houthis, is criminal, outrageous, extreme, wanton, willful, malicious, and a threat to the public warranting an award of punitive damages.

125.    Such conduct violates 28 U.S.C. § 1605A.

126.    A private right of action is established under 28 U.S.C. § 1605A(c) for violations of that section leading to injuries that "may include economic damages, solatium, pain and suffering, and punitive damages."

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court award damages to Plaintiffs against Iran on all Counts, and grant Plaintiffs:

For Count I, the following:

    a.  Compensatory damages for personal injuries to Mikael Gidada, including pain and suffering, in the amount of $20,000,000, or a sum certain to be determined at trial;

    b.  Economic losses suffered by Mikael Gidada in the amount of $5,000,000, or a sum certain to be determined at trial;

    c.  Solatium damages in a total amount of $15,000,000 comprised of the following sums:

-   $5,000,000 to Juanita Gidada, mother of Mikael Gidada;
-   $2,500,000 to Ayane Gidada, sister of Mikael Gidada;
-   $2,500,000 to David Gidada, brother of Mikael Gidada;
-   $2,500,000 to John Gidada, brother of Mikael Gidada;
-   $2,500,000 to Lilu Gidada, sister of Mikael Gidada;

d.   Punitive damages in the amount of $150,000,000, divided proportionately between Mikael Gidada and his family, in line with their respective awards of compensatory damages;

e.   Interest, from April 30, 2018 until the date of judgment; and

f.   Such other and further relief as the Court may determine to be just and equitable under the circumstances.

For Count II, the following:

a.   Compensatory damages for personal injuries to Sandra Loli, including pain and suffering, in the amount of $20,000,000, or a sum certain to be determined at trial;

b.   Economic losses suffered by Sandra Loli in the amount of $5,000,000, or a sum certain to be determined at trial;

c.   Solatium damages in a total amount of $18,000,000 comprised of the following sums:

-   $8,000,000 to Richard Alan Boni, husband of Sandra Loli;
-   $5,000,000 to Richard Abdullah Boni, son of Sandra Loli;
-   $2,500,000 to Lisa Mitchell, sister of Sandra Loli;
-   $2,500,000 to Catherine Anderson, sister of Sandra Loli;

d.   Punitive damages in the amount of $150,000,000, divided proportionately between Sandra Loli and her family, in line with their respective awards of compensatory damages;

e.   Interest, from June 11, 2019 until the date of judgment; and

f.   Such other and further relief as the Court may determine to be just and equitable under the circumstances.

PLAINTIFFS DEMAND A TRIAL BY JURY.

Dated: September 3, 2021          Respectfully submitted,

                                           _____/s/ Kevin A. Hoffman_____
                                           Randy D. Singer (DCD Bar No. VA057)
                                           Kevin A. Hoffman (DC Bar No. 1044559)
                                           SINGER DAVIS, LLC
                                           1209A Laskin Road
                                           Virginia Beach, VA 23451
                                           Phone: (757) 301-9995
                                           Fax: (757) 233-1084
                                           Email: randy.singer@singerdavis.law
                                           Email: kevin.hoffman@singerdavis.law
                                           *Counsel for Plaintiffs*