# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MIKAEL GIDADA, *et al.*,<br><br>         *Plaintiffs*,<br><br>    v.<br><br>ISLAMIC REPUBLIC OF IRAN,<br><br>         *Defendant*. | Civil Action No. 21-2338 (RDM) |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case arises from the kidnapping and detention of two United States citizens by members of the Houthi militant group in Yemen in 2018 and 2020.  Plaintiffs Mikael Gidada, Sandra Loli, and their family members bring this suit against the Islamic Republic of Iran, invoking the state-sponsored terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(a).  Although Plaintiffs allege that they were kidnapped and detained by Houthi rebels in Yemen, they bring this action against Iran on the theory that Iran provided "material support" to the Houthis, who then used that support to take Gidada and Loli hostage and torture them, Dkt. 1 at 4 (Compl. ¶ 19); *see* 28 U.S.C. § 1605A(c).

Because Iran has not answered or otherwise appeared in this litigation, the Clerk of Court entered a default at Plaintiffs' request on August 23, 2022.  Dkt. 15.  Plaintiffs now move the Court for an entry of default judgment against Iran.  Dkt. 17.  As explained below, Plaintiffs have established their right to relief under 28 U.S.C. § 1605A(c).  Accordingly, the Court will **GRANT** Plaintiffs' motion for the entry of a default judgment against the Islamic Republic of Iran.  The Court has referred the matter to a Special Master to assist in evaluating Plaintiffs' damages.  Dkt. 20.

# I. INTRODUCTION

Plaintiffs Mikael Gidada, Sandra Loli, and nine of their U.S. citizen family members bring this action against Defendant the Islamic Republic of Iran seeking damages arising out of the alleged hostage taking and torture of Gidada and Loli in Yemen at the hands of the Houthi militant group. *See generally* Dkt. 1 (Compl.). Plaintiffs proceed against Iran on the theory that Iran "knowingly and intentionally provid[ed] material support and resources to enable and assist the Houthis in carrying out acts of terrorism against Americans" and that it thus is "liable for the damages suffered by Plaintiffs as a direct and proximate result of the hostage taking and torture" of Gidada and Loli. *Id*. at 4 (Compl. ¶ 19). Plaintiffs effected service on the Islamic Republic of Iran on June 15, 2022 in the manner prescribed by the FSIA. *See* Dkt. 15 at 1. Iran has not answered, filed a motion under Federal Rule of Civil Procedure 12, or otherwise appeared.

Plaintiffs now seek entry of a default judgment against the Islamic Republic of Iran pursuant to Federal Rule of Civil Procedure 55. Dkt. 17 at 1. Entry of a default judgment is not automatic, however, and requires the Court to exercise its sound discretion. *See Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005); *Sanchez v. Devashish Hosp.*, 322 F.R.D. 32, 36 (D.D.C. 2017); *Boland v. Yoccabel Constr. Co.*, 293 F.R.D. 13, 17 (D.D.C. 2013) (citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)). Most notably, the Court must—as in all cases— satisfy itself that it has subject-matter jurisdiction over the claims and personal jurisdiction over the defendant. *See Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014) ("A default judgment rendered in excess of a court's jurisdiction is void."); *Mwani*, 417 F.3d at 6 (explaining that a court must "satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant").

In cases brought against a foreign state, however, the Court's discretion to enter a default judgment is further circumscribed.  By statute, no federal or state court may enter a default judgment against a foreign state or instrumentality "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  This is the same standard that applies to default judgments against the United States under Federal Rule of Civil Procedure 55(d).  *See Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020); *Hill v. Republic of Iraq*, 328 F.3d 680, 683 (D.C. Cir. 2003).  In a case such as this, which alleges that a foreign state materially supported acts of terrorism, the district court must determine "how much and what kinds of evidence the plaintiff must provide."  *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014).  And the Court must do so in light of both Congress's purpose in enacting § 1605A—that is, to "compensate[e] the victims of terrorism [so as to] punish foreign states who have committed or sponsored such acts and [to] deter them from doing so in the future," *id*. at 1048 (first alteration in original) (internal citation omitted)—and the difficulty in obtaining "firsthand evidence and eyewitness testimony . . . from an absent and likely hostile sovereign," *Owens*, 864 F.3d at 785.  As a result, Plaintiffs carry the burden of (1) producing evidence sufficient to show that their claims fall within the state-sponsored terrorism exception to the FSIA, *see* 28 U.S.C. § 1605A(a); *Owens*, 864 F.3d at 784; (2) showing that Iran was served in accordance with the FSIA, *see* 28 U.S.C. § 1608(a); and (3) establishing their right to relief under federal law, *see* 28 U.S.C. § 1605A(c); *Owens*, 864 F.3d at 808, by offering evidence "satisfactory to the court," 28 U.S.C. § 1608(e).

Plaintiffs seek to carry this burden using three types of evidence: First, they have submitted sworn affidavits from Gidada and Loli, in which they recount their abductions,

detention, and treatment at the hands of the Houthis.  Dkt. 17-2 (Gidada Aff.); Dkt. 17-3 (Loli

Aff.).  Second, they have asked the Court to take judicial notice, Dkt. 17 at 5–7, of the testimony

and evidence that was presented in *Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85

(D.D.C. 2019), and *Coombs v. Islamic Republic of Iran*, 2022 WL 715189 (D.D.C. Mar. 10,

2022), two FSIA cases that also involved abductions of U.S. citizens by Houthi militants in

Yemen.  Finally, they have submitted an expert affidavit from Michael Pregent, Dkt. 17-4

(Pregent Aff.), a former intelligence officer and senior fellow at the Hudson Institute, whom this

Court qualified in *Hamen* as an "expert on the [Islamic Revolutionary Guard Corps] Qods Force

and Iranian efforts to influence political activity in Yemen, Iraq, Syria, and Lebanon," 401 F.

Supp. at 91 n.1, and whose qualifications this Court reaffirmed in *Coombs*, 2022 WL 715189, at

*3 n.1.  In addition to providing relevant updates since January 2022, Pregent "confirm[ed] and

reaffirm[ed] the truth and accuracy of each statement made during each instance of [his] prior

testimony [in *Hamen* and *Coombs*], without need for retraction or amendment, despite the

benefit of hindsight and [his] observation of subsequent developments."  Dkt. 17-4 at 3 (Pregent

Aff. ¶ 11).

　　　In the course of reviewing the evidence, the Court has applied the Federal Rules of

Evidence, but has done so based on the understanding, first, that it has "the authority—indeed,

. . . the obligation—to 'adjust [evidentiary requirements] to . . . differing situations,'" *Han Kim*,

774 F.3d at 1048 (second and third alterations in original) (quoting *Bundy v. Jackson*, 641 F.2d

934, 951 (D.C. Cir. 1981)), and, second, that the Court need not "step into the shoes of the

defaulting party and pursue every possible evidentiary challenge," *Owens*, 864 F.3d at 785.

Expert testimony, moreover, is not only entirely proper in FSIA cases, but often sufficient, *see*

*id.* at 787–89, and even indispensable in "terrorism cases . . . because firsthand evidence of

terrorist activities is difficult, if not impossible, to obtain," *id.* at 787.  Whether through expert testimony or other competent evidence, though, the Court must ultimately determine whether Plaintiffs have "substantiate[d] [the] essential element[s] of jurisdiction" with admissible evidence.  *Id.* at 786.

Based on this record, the Court now makes the following findings of fact and conclusions of law.

## II.  FINDINGS OF FACT

In addition to submitting affidavits from Gidada, Loli, and Pregent, Plaintiffs also ask the Court to take notice of the evidence and testimony presented in *Hamen* and *Coombs*.  *See Salzman v. Islamic Republic of Iran*, 2019 WL 4673761, at *3 (D.D.C. 2019).  The evidentiary presentation in *Hamen* included testimony from eleven witnesses (including experts) and over a dozen exhibits (including government reports).  401 F. Supp. 3d at 91.  In *Hamen*, the Court heard testimony from, among others, expert Michael Pregent, *id.*, and in *Coombs* the Court considered an affidavit from Pregent and took judicial notice of the evidence and testimony presented in the *Hamen* case.  2022 WL 715189, at *3.

Although prior decisions in this district "have . . . frequently taken judicial notice of earlier, related proceedings," *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010), that does not mean that the Court may simply accept the facts found in the earlier opinion, which would amount to a prohibited exercise of collateral estoppel, *see Weinstein v. Islamic Republic of Iran*, 175 F. Supp. 2d 13, 20 (D.D.C. 2001) ("[F]indings of fact made during the course of this type of one-sided [FSIA] hearing should not be given a preclusive effect.").  The Court may, however, "review evidence considered in" a prior proceeding "without necessitating the re-presentment of such evidence."  *Murphy v. Islamic Republic of Iran*, 740 F.

Supp. 2d 51, 59 (D.D.C. 2010). With that standard in mind, the Court has reviewed the exhibits admitted into evidence and the testimony presented in the *Hamen* and *Coombs* cases and has considered that evidence for the purposes of this proceeding as well.

Based on that evidence and the affidavits that Plaintiffs have submitted in this case, the Court finds as follows: First, Iran has provided the Houthis with significant support, either directly or indirectly through proxies, in the form of training, weapons, and funding, as part of its larger strategy to use proxy groups to destabilize the region. Second, the Houthis would not have been in a position to effectuate the abductions of Gidada and Loli without the assistance of Iran. Third, the Houthis would not have attempted the kidnapping and hostage taking of Gidada and Loli without the backing of Iran. The Court ultimately finds that, through these actions, Iran supported the hostage taking of Gidada and Loli. The Court will discuss the factual foundation for each of these conclusions in turn.

A.      **Iran's Provision of Support to the Houthis**

1.      *Overview of Iran's Proxy Strategy*

Since the Iranian Revolution in 1979, Iran has sought to maintain influence over other countries in the region, including Lebanon, Syria, and Yemen, by pursuing a strategy of "destabilizing" and "fractur[ing]" the governments in those countries. *Hamen*, No. 16-cv-1394, Dkt. 48 at 173–74 (Pregent).[1] One of the principal ways that Iran has sought to achieve this goal

---

[1] Many of the Court's findings in this section are derived from the expert testimony of Michael Pregent and Dr. Daniel Green. After considering the requirements of Federal Rule of Evidence 702, the Court in *Hamen* qualified Pregent as an expert on the Islamic Revolutionary Guard Corps Qods Force and Iranian efforts to influence political activity in Yemen, Iraq, Syria, and Lebanon, *Hamen*, No. 16-cv-1394, Dkt. 48 at 172, and qualified Green as an expert on terrorism, insurgency, and counter-insurgency issues generally in the Middle East, and particularly as related to Iran and its activities in Yemen, *Hamen*, No. 16-cv-1394, Dkt. 49 at 41. *See Hamen*, 401 F. Supp. 3d at 91–92 n.1. The Court in *Coombs* "re-reviewed the testimony of Pregent and

6

is by financing and supporting local groups known as "proxy organizations," which Iran, in turn, uses to "strategically carry out Iran's goals." *Id.* (Pregent). By using these groups as surrogates, Iran is able to achieve its goals in the region, while plausibly denying responsibility for the actions of its proxies.

The Iranian military body responsible for identifying and training proxy organizations is known as the Islamic Revolutionary Guard Corps Qods Force ("Qods Force"). *Id.* at 173–74 (Pregent). The Qods Force is the "external operating body" of the Iranian government, *id.* at 174 (Pregent), and it "focuses on conducting foreign operations which support insurgents and terrorists," *Hamen*, No. 16-cv-1394, Dkt. 32-4 at 8 (Green Aff. ¶ 33). The commander of the Qods Force at the time, General Qasem Soleimani, reported directly to the Supreme Leader of Iran, Ali Khomeini. *Hamen*, No. 16-cv-1394, Dkt. 48 at 174 (Pregent).

The Qods Force coordinates with proxy militant groups to conduct terrorist attacks by providing weapons, training, funding, and guidance. *Id.* at 179–80 (Pregent); *Hamen*, No. 16-cv-1394, Ex. 10 at 3.[2] Once the Qods Force develops a relationship with a group, it supplies weapons, which range from small arms such as AK-47s to sophisticated weaponry such as

---

Green and reaffirm[ed] their qualifications as experts.' *Coombs*, 2022 WL 715189, at *3 n.1. The Court has re-reviewed the testimony of Pregent and Green and again reaffirms their qualifications as experts.

[2] Exhibit 10 from the *Hamen* case is a press release, entitled "Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism," *Hamen*, No. 16-cv-1394, Ex. 10 at 1, that describes U.S. Government actions "to counter Iran's . . . support for terrorism," *id.* at 1. In *Hamen*, the Court concluded that this exhibit was admissible under the public records exception to the hearsay rule, which provides that "a record or statement of a public office" is admissible if it contains "factual findings . . . from a legally authorized investigation" and does not "indicate a lack of trustworthiness." Fed. R. Evid. 803(8); *see also Owens*, 864 F.3d at 792. The Court in *Coombs* re-reviewed the exhibit and reaffirmed its admissibility finding in *Hamen*. *Coombs*, 2022 WL 715189, at *4 n.2. The Court has again re-reviewed the exhibit and reaffirms its finding of admissibility.

antitank weapons and explosively formed penetrators, depending on the group's training and capability. *Hamen*, No. 16-cv-1394, Dkt. 48 at 180–81 (Pregent); *Hamen*, No. 16-cv-1394, Dkt. 49 at 63–64 (Pregent). The Qods force also trains proxies to use those weapons, both in the home countries of the proxies and in other areas in the region. *Hamen*, No. 16-cv-1394, Dkt. 48 at 182–83 (Pregent).

In addition to military support and training, the Qods Force "exports" to its proxies a "collection of behaviors[,] tactics, and capabilities," *Hamen*, No. 16-cv-1394, Dkt. 49 at 111 (Green), which includes other terrorism techniques such as "bomb making" and "assassination and kidnapping," *Hamen*, No. 16-cv-1394, Dkt. 48 at 182 (Pregent). Of particular relevance here, Iran encourages its proxy groups to kidnap "high value targets" by providing "incentives" in the form of "a bounty or reward." *Id.* at 191–92 (Pregent). The "highest value target" to Iran is an American. *Id.* (Pregent). The Qods Force also typically exercises control over its proxies' efforts to kidnap Americans because such operations and subsequent negotiations are complex and risk implicating Iran if not properly manages. *Id.* at 16–18 (Pregent).

According to the U.S. Department of the Treasury, the Qods Force has supported militant groups including the Taliban, Hamas, and—as relevant here—the Lebanese Hezbollah ("Hezbollah"). *Hamen*, No. 16-cv-1394, Ex. 10 at 3. As a result of these activities, the State Department has designated Iran as a state sponsor of terrorism, *see* U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/j/ct/list/c14151.htm (last visited June 10, 2024), and the Treasury Department has designated the Qods Force as providing support for terrorism, *Hamen*, No. 16-cv-1394, Ex. 10 at 1, 3.

2.      *Hezbollah*

Hezbollah's role as an Iranian proxy force is relevant to this case in two respects.  First, it serves as an example of how Iran cultivates militant organizations in other countries and employs them as surrogates—a model that Iran applied to the Houthis in Yemen.  *Hamen*, No. 16-cv-1394, Dkt. 48 at 185–86 (Pregent).  Second, Hezbollah served as a liaison between Iran and the Houthis to provide training and regular financial support.

The Qods Force has developed Hezbollah as a proxy for over 20 years.  *See id.* at 185 (Pregent).  As a result of that ongoing and established relationship, Hezbollah is today regarded as the "gold standard" for what Iran hopes to achieve with proxy militias in Afghanistan, Syria, Iraq, and Yemen.  *Id.* at 184–85 (Pregent).  In particular, Hezbollah is directed by the Qods Force to conduct external operations on Iran's behalf, and, in order to facilitate those efforts, Iran provides Hezbollah with a budget of roughly $200 million per year.[3]  *Id.* at 185–86 (Pregent).  Hezbollah's "3800 Unit" is responsible for Hezbollah's training activities that support other proxy militias—including the Houthis—and the 3800 Unit develops a closer relationship with the proxies through proximity and frequent interactions.  *Id.* at 190 (Pregent).  To further strengthen its relationship with other proxies, Hezbollah often distributes funding to these groups at Iran's direction.  *Id.* at 191 (Pregent).  The Qods Force maintains oversight over Hezbollah and its 3800 Unit by sending advisers to oversee the Unit and to meet with proxy leadership.  *Id.* at 192 (Pregent).

---

[3] To the extent these dollar figures "recit[e] potentially inadmissible facts," the Court concludes that they appropriately "disclose" a portion of the "factual basis for" the admissible expert testimony.  *Owens*, 864 F.3d at 790.  The same is true with respect to various other "potentially inadmissible facts," *id.*, referenced in Plaintiffs' expert testimony and reports.

Also relevant here, the 3800 Unit's training of proxy groups typically includes not only weapons training, but also training in kidnapping and hostage-taking techniques, focusing on American targets. *Hamen*, No. 16-cv-1394, Dkt. 49 at 16 (Pregent). Notably, Hezbollah trains proxy groups to target lower profile Americans (*i.e.*, not high-ranking officials or diplomats), such as enlisted soldiers and contractors, to avoid triggering a military response. *Id.* at 16–17 (Pregent). Specific techniques include using American accents either to gain access to the target or to interrogate the detainee. *Id.* at 18 (Pregent).

Based on this evidence, and consistent with numerous other decisions from this Court, the Court finds that Hezbollah is an Iranian proxy. *See, e.g.*, *Coombs*, 2022 WL 715189, at *5; *Hamen*, 401 F. Supp. 3d at 93; *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 60 (D.D.C. 2018); *Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran*, 313 F. Supp 3d 50, 54–55 (D.D.C. 2018).

### 3. *The Houthis*

#### a. Origins

The Houthis originate from the Saada Governorate region in the northwest of Yemen, near the border of Saudi Arabia. The group began as a localized insurgency, which protested the Yemeni government's economic discrimination and political marginalization of the region. *Hamen*, No. 16-cv-1394, Dkt. 49 at 43–44 (Green); *Hamen*, No. 16-cv-1394, Dkt. 32-4 (Green Aff. ¶ 20). The Houthis, like many northern Yemenis, subscribe to the Zaidi Shia religion, which differs from the Iranian Shia religion and from the religion of most Yemenis, which is Sunni. *Hamen*, No. 16-cv-1394, Dkt. 49 at 44 (Green). The Houthis are named for one of its leading families—the al-Houthis—and adopted that family name when the group's first leader, Hussain al-Houthi, was killed by government forces. Hussain al-Houthi "embrace[d] the radical

elements of Iranian foreign policy" since travelling there in 1986, including "a rabid opposition to the United States and Israel." *Hamen*, No. 16-cv-1394, Dkt. 32-4 at 6 (Green Aff. ¶ 24). Before his death, Hussain al-Houthi popularized the Houthi chant, known as the "sarkha," of "God is great! Death to America! Death to Israel! A curse upon the Jews! Victory for Islam!" *Hamen*, No. 16-cv-1394, Dkt. 51-1 at 1 (Green Suppl. Aff. ¶¶ 5–6).

Until the early 2000s, the Houthis remained a localized insurgency. *Hamen*, No. 16-cv-1394, Dkt. 49 at 43–44 (Green). In 2004, however, the government of Yemen launched a military campaign against the Saada Governorate region, and the al-Houthi family in particular, which triggered a period of "six wars" between the Houthis and the Yemeni government. *Id.* at 45–46 (Green). Even at this early stage in the Houthis' history, Iran supported and exerted influence over the group, but Iran's influence was limited at the time, and the Yemeni government remained strong. *Id.* at 46–47, 96 (Green). The six wars officially came to an end in 2010, when, after much death and destruction, both sides signed a peace accord. *Id.* at 46 (Green).

In 2011, the Arab Spring movement took hold in Yemen, which led to broad-based demonstrations against the government. *Hamen*, No. 16-cv-1394, Dkt. 32-4 at 7 (Green Aff. ¶ 30). These protests, coupled with "poor governance, corruption, and incompetence[,] . . . contributed to a general collapse of government control throughout the country." *Id.*; *accord Hamen*, No. 16-cv-1394, Dkt. 49 at 48 (Green). In 2012, Ali Abdullah Saleh resigned as President of Yemen, and a provisional government, backed by the United Nations and the international community, took control. *Hamen*, No. 16-cv-1394, Dkt. 49 at 49–51 (Green). Saleh retained power and influence, however, particularly in his home province in the north of Yemen, and sections of the Yemeni military remained loyal to him. *Id.* at 50, 54 (Green).

During this political transition, Iran took steps to "deepen its relationship with the

Houthis and to expand its assistance to the group." *Hamen*, No. 16-cv-1394, Dkt. 32-4 at 8

(Green Aff. ¶ 31); *see also Hamen*, No. 16-cv-1394, Dkt. 49 at 6 (Pregent) ("[T]he IRGC-Qods

Force increase[d] the Houthis' capabilities during the 2010–2011 uprisings."). With Iran's

backing, the Houthis took up arms against the Yemeni government and began to infiltrate

Yemen's capital city of Sana'a. *Hamen*, No. 16-cv-1394, Dkt. 49 at 54 (Green). During this

time, the Houthis—enabled by Iran—also joined forces with former President Saleh, forming a

coalition with the goal of isolating and marginalizing the Yemeni government under Hadi's

authority. *Id.* at 54 (Green). In 2014, the Houthis attacked Sana'a, seizing the city and forcing

President Hadi to flee to the south of Yemen. *Id.* at 53–54 (Green). The Houthis solidified their

control of the city by seizing the homes of opponents who had fled, undertaking an assassination

campaign against prominent leaders, and initiating a detention program against potential

opponents. *Id.* at 55–56 (Green). When the Houthis took control of Sana'a in February 2015,

the United States withdrew its diplomatic personnel. *Id.* at 54–55 (Green). The Houthis

maintained political and military control over the city of Sana'a throughout the time of the

alleged hostage taking and detention of Gidada and Loli. Dkt. 17-4 at 7 (Pregent Aff. ¶ 32).

    b.    <u>Iran's Provision of Funding, Weapons, and Training</u>

There is ample evidence that Iran has facilitated arms shipments to the Houthis since at

least 2009. *Hamen*, No. 16-cv-1394, Dkt. 49 at 58–64 (Green); *Hamen*, No. 16-cv-1394, Dkt.

32-4 at 13 (Green Aff. ¶¶ 49–50). The evidence submitted in the *Hamen* case, which the Court

considers here as well, shows that numerous shipments originating in Iran and carrying Iranian-

made weapons—ranging from small arms to advanced weaponry—have been recovered on their

way to Houthi territory. *Hamen*, No. 16-cv-1394, Dkt. 49 at 58–64 (Green). Arms shipments

including ammunition, rocket-propelled grenade launchers, 122 millimeter rockets, C4 plastic explosive blocks, electrical equipment that can be used to manufacture improvised explosive devices, AK-47s, unmanned aerial vehicles, and explosively formed penetrators, have been intercepted on their way to Houthi territory. *Id.* at 58–59, 63 (Green). The weapons shipped, moreover, have become increasingly sophisticated over time. *Id.* at 63 (Green).

There is also evidence of Houthi use of Iranian-made weapons: Iranian-made SCUD missiles were fired at Saudi Arabia from Houthi-controlled territory, *id.* at 65–66 (Green); *id.* at 7–12 (Pregent); the Houthis used an Iranian "Shark 33" attack boat to attack the Saudis, *id.* at 13–14 (Pregent); and the Houthis used Iranian-made sea mines in southern Yemen, *id.* at 66 (Green). Iran has continued to supply arms and arms-related material to the Houthis despite agreeing not to do so as part of the (now-defunct) 2015 Joint Comprehensive Plan of Action with the United States and United Nations. *Id.* at 70–85 (Green). Nor is there any indication that Iran provided support of this type to any group in Yemen other than the Houthis, *id.* at 14 (Pregent), confirming the conclusion that the intercepted arms shipments were intended for the Houthis. The repeated nature of the shipments and the variety and sophistication of armaments, moreover, reflect a significant, long-term commitment on behalf of Iran to offering military support to the Houthis. *Hamen*, No. 16-cv-1394, Dkt. 32-4 at 14 (Green Aff. ¶ 51). Iran has also provided financial support to the Houthis. There is evidence, for example, that Iran directed Hezbollah's 3800 Unit to provide $50,000 per month, or about $600,000 per year, to the Houthis. *Hamen*, No. 16-cv-1394, Dkt. 48 at 187–91 (Pregent).

In addition to providing financial support and weapons, Iran has provided training to the Houthi militants, either directly or through Hezbollah. Since 2009, Houthi militants have received training at Hezbollah training camps, *Hamen*, No. 16-cv-1394, Dkt. 49 at 15 (Pregent),

including in Lebanon, Syria, and Iraq, *id.* at 96 (Green).  Beginning in 2011, Iran assigned Qods Force officer Abdul Reza Shahlai as the leader of its efforts to "advise, assist, resource, and train the Houthis."  *Hamen*, No. 16-cv-1394, Dkt. 32-4 (Green Aff. ¶ 32); *Hamen*, No. 16-cv-1394, Dkt. 49 at 53, 64, 96 (Green).  In 2013 and 2015, select Houthis participated in combat in Syria after having undergone training in Hezbollah training camps.  *Hamen*, No. 16-cv-1394, Dkt. 49 at 15–16 (Pregent).  In October 2014, several 3800 Unit members were captured in Yemen while training the Houthis.  *Id.* at 18–19 (Pregent).  Hezbollah leaders have also confirmed training the Houthis in Yemen, Lebanon, and Iran.  *Hamen*, No. 16-cv-1394, Dkt. 32-4 at 11 (Green Aff. ¶ 43).

Of particular relevance here, there is evidence that Iran trained the Houthis on hostage taking and kidnapping techniques.  Although kidnapping was used as a political tool in Yemen prior to Iran's influence, those tactics predominantly involved kidnapping other Yemenis. *Hamen*, No. 16-cv-1394, Dkt. 49 at 68–69 (Green).  As the Court has explained in previous opinions, however, the Houthis seized and held four civilian Americans, Casey Coombs, Scott Darden, Haisam Farran, and Wallead Luqman, in the spring of 2015, *see Coombs*, 2022 WL 715189, at *1; *Hamen*, No. 16-cv-1394, Dkt. 51-1 at 1 (Green Suppl. Aff. ¶¶ 1–4); *Hamen*, No. 16-cv-1394, Dkt. 49 at 108 (Green), before taking two other civilian Americans, Mark McAlister and John Hamen, hostage in October 2015, *see Hamen*, 401 F. Supp. 3d at 89.  And, as further discussed below, the Houthis seized and held Gidada and Loli, also civilian Americans, in August 2018 and June 2019, respectively.  The experts who testified in the *Hamen* case both agreed that, due to the risk and complexity of kidnapping Americans and holding them hostage, the Houthis would not have taken Americans and other foreigners hostage without the backing of Iran.  *Hamen*, No. 16-cv-1394, Dkt. 49 at 69 (Green); *id.* at 21–22 (Pregent).

Although Iran has denied assisting the Houthis, *id.* at 76 (Green), Iran's Supreme Leader Ayatollah Ali Khamenei stated in May of 2015 that "Yemen, Bahrain and Palestine are oppressed, and we protect oppressed people as much as we can," *id.* at 87 (Green).  Similarly, Iranian Brigadier General Masoud Jazayeri, the deputy chief of staff of the Iranian armed forces, stated in March of 2016 that "[t]he Islamic Republic felt its duty to help . . . the people of Yemen in any way it can and to a level necessary."  *Id.* at 88 (Green).  In 2014, an unnamed senior Iranian official stated that "[t]he Qods Force had a 'few hundred' military personnel in Yemen to train Houthi fighters."  *Id.* at 88 (Green).  In light of the evidence as whole, these statements show that Houthi support was authorized by Iranian officials at the highest level.

Without Iranian backing, the Houthis would not have been able to exert power or control outside of their home province of Saada; would not have been able to seize the capital city of Sana'a or to maintain control of the city; and would not have developed the tactic of taking American nationals hostage.  *Id.* at 112–13 (Green); *id.* at 20–22 (Pregent); Dkt. 17-4 at 7 (Pregent Aff. ¶¶ 28–31).

**B.    Abduction and Detention of Mikael Gidada**

Mikael Gidada first travelled to Yemen in 2001 to pursue commercial business opportunities there.  Dkt. 17-2 at 1 (Gidada Aff. ¶ 5).  Over the next two decades, he operated various businesses in Yemen, including mining, export, and water bottling companies.  *Id.* (Gidada Aff. ¶ 5).  After the Houthis seized Sana'a, Gidada attempted to secure travel out of Yemen, but was unable to obtain safe transport.  *Id.* at 3 (Gidada Aff. ¶ 15).  He remained in Yemen and continued operating his businesses under the new regime.  *Id.* (Gidada Aff. ¶ 15).

In March 2018, Gidada learned that his business partner had been assassinated.  *Id.* at 4 (Gidada Aff. ¶ 16).  Although he intensified his efforts to leave the country, he was unable to

find a safe way to do so and remained in Sana'a, where "it was becoming increasingly difficult to avoid the Houthi soldiers roaming the streets." *Id.* (Gidada Aff. ¶ 16). On the morning of April 30, 2018, several masked men came to Gidada's home, "handcuff[ed] and blindfold[ed] [him]" and "repeatedly struck [him] with their guns and forced [him] to comply with their demands." *Id.* (Gidada Aff. ¶ 18). Gidada was taken to a building he later understood to be the National Security Bureau, a large detention facility operated by the Houthis. *Id.* (Gidada Aff. ¶ 19).

For the next two-and-a-half years, he was imprisoned in a "small, brightly lit cell" and spent his days "in solitary confinement." *Id.* (Gidada Aff. ¶ 20). During his imprisonment, Gidada was "interrogated and physically and mentally tormented" thirty-nine times, with the episodes varying in duration from an hour to twelve hours long. *Id.* (Gidada Aff. ¶ 23). Some interrogations took place in a conference room decorated with portraits of Iran's Supreme Leader Ayatollah Ali Khamenei and the commander of the Qods Force at the time, General Qasem Soleimani. *Id.* at 5 (Gidada Aff. ¶ 24); *see also Hamen*, No. 16-cv-1394, Dkt. 48 at 174 (Pregent). The interrogators questioned Gidada about his presence in Yemen, threatening that "[he] would die in prison" unless he admitted to "spying on behalf of America and Israel." Dkt. 17-2 at 5 (Gidada Aff. ¶ 25).

During these interrogations, Gidada was "beaten and forced to chug water," was "forced to do hard physical exercises, such as squats, while lifting heavy objects and being whipped with an electrical wire," and was "forced to stand outside all day without food, shade or water." *Id.* (Gidada Aff. ¶ 26). Gidada was allowed to use the bathroom "three times a day for about four minutes at a time," but aside from these visits he was forced "to use a bucket or bottle in [his] cell." *Id.* (Gidada Aff. ¶ 28). He was allowed to shower "once every few months." *Id.* (Gidada

Aff. ¶ 29).  And his drinking water came "exclusively from the bathroom faucet," which caused
him "stomach pain and digestive problems throughout [his] captivity."  *Id.* (Gidada Aff. ¶ 29)

The physical abuse that Gidada endured led him to develop a "dangerous hernia," which
resulted in "urgent need for hospitalization and a surgical operation."  *Id.* at 6 (Gidada Aff. ¶ 31).
During the operation, Gidada was "chained hand and foot to [his] bed with seven armed guards
watching over [him]" to prevent his possible escape.  *Id.* at 6 (Gidada Aff. ¶ 31).  Throughout his
imprisonment, Gidada was "allowed contact with [his] family once a year" in the form of a time-
limited phone call.  *Id.* (Gidada Aff. ¶ 32–33).  He only occasionally "had the opportunity to
speak with fellow detainees."  *Id.* (Gidada Aff. ¶ 35).  In addition to physical abuse, Gidada was
forced to provide his email passwords and then forced to explain over twenty years of private
and business emails, by signing and dating each printed page.  *Id.* at 6–7 (Gidada Aff. ¶ 30).

On October 14, 2020, after 899 days of imprisonment, Gidada was released into the
custody of an Omani diplomatic delegation as part of a "negotiated prisoner swap."  *Id.* at 7
(Gidada Aff. ¶¶ 20, 37).  In total, 238 Houthi soldiers were freed and returned to Yemen "several
hours before [his] release."  *Id.* (Gidada Aff. ¶ 37).  As a result of his imprisonment, Gidada
suffered physical, emotional, and financial injuries.  After his release, he suffered a stroke "for
which [he] was immediately hospitalized."  *Id.* (Gidada Aff. ¶ 41).  In addition, he was
diagnosed with "severe type two diabetes, high blood pressure, . . . high cholesterol, and an
enlarged hernia," which required "another hospitalization and surgery."  *Id.* (Gidada Aff. ¶ 41).
Since then, he has struggled with depression, anxiety, and feelings of helplessness.  *Id.* at 8
(Gidada Aff. ¶ 43).  Despite Gidada's release, none of his possessions were returned to him, his
businesses were "completely destroyed," and his investments, including a local Yemeni bank
account, were rendered "inaccessible to [him]."  *Id.* at 7 (Gidada Aff. ¶ 38).

**C.      Abduction and Detention of Sandra Loli**

From 2014 to 2019, Sandra "Sam" Loli worked for the Silver Filter Company, a for-profit business owned by her husband and his Yemeni partner that "supervised the production of ceramic water filters and marketed the product to international and local organizations." Dkt. 17-3 at 2 (Loli Aff. ¶ 7).  Loli's role within the company required her to travel frequently between Yemen and the United States, "spending about 40% of [her] time in Sana'a." *Id.* (Loli Aff. ¶ 8).  That changed in May 2016 when "all commercial flights into Sana'a were canceled." *Id.* (Loli Aff. ¶ 9).

Loli's last trip to Yemen, and the sole trip she took after May 2016, was in April 2019, when she travelled to Sana'a by flying first to Cairo, Egypt, then from Cairo to Aden, Yemen, and from there driving to Sana'a. *Id.* (Loli Aff. ¶ 9).  At the time, Silver Filter was registered in Sana'a at the Ministry of Industry and Trade and had "had its registration renewed by the Houthi authorities." *Id.* (Loli Aff. ¶ 9).  On "all of [her] trips to and from Yemen," Loli had "never experienced any issues with obtaining a visa or work permit from the security authorities, including [from] the Houthis once they were in power." *Id.* at 3 (Loli Aff. ¶ 12).  The "authorities had visited the company and understood that it was an American/Yemeni owned company." *Id.* at 2 (Loli Aff. ¶ 9).

On June 11, 2019, Loli left her home in Sana'a to travel by car to Aden, where she planned to board a flight to Cairo and eventually Montreal, Canada.  *Id.* at 3 (Loli Aff. ¶ 13). When she and Silver Filter's accountant arrived at the first checkpoint, they were "stopped by uniformed military personnel and asked to pull to the side of the road," where "several men dressed in civilian clothing came to inspect [her] visa and travel documents." *Id.* at 4 (Loli Aff. ¶ 15).  The "checkpoint was under the Houthi government's control and there were signs posted

with Houthi slogan[s] and logo[s] all around." *Id.* (Loli Aff. ¶ 15).  Loli was ordered to "turn[]

over all the electronic devices" and was "driven to a military camp," which she knew to be a

Houthi military camp; she again observed "Houthi signs and slogans all around."  *Id.* at 4–5 (Loli

Aff. ¶¶ 16, 19).  Loli was blindfolded, separated from her companion, and led inside "a bunker

with a dirt floor" where her personal belongings were inspected and inventoried.  *Id.* at 5 (Loli

Aff. ¶¶ 20 – 23).  A man said to Loli in "very good English":  "[D]o not be afraid, you are with

the [Houthi] government.  You have nothing to worry about if you tell the truth and don't hide

anything."  *Id.* (Loli Aff. 22).

   Loli was then blindfolded again and driven to an unknown location where she was kept in

solitary confinement for about four months in a small room, approximately thirteen-by-

seventeen-feet large.  *Id.* at 6 (Loli Aff. ¶¶ 24–25, 27).  The room contained a small floor

cushion, a water bottle, and one "foul-smelling blanket" that Loli could smell "from over 10'

away."  *Id.* (Loli Aff. ¶ 27).  About one-quarter of the room was sectioned off by a plywood

divider.  *Id.* at 6–7 (Loli Aff. ¶ 27, 29).  In the beginning, female guards sat on the other side of

the divider, where they could watch Loli through a fisheye peephole, and slept there at night.  *Id.*

(Loli Aff. ¶ 29).  Later on, the guards would sit in an adjacent room watching Houthi-owned

television stations; Loli could often hear the Houthi refrain of "death to America" from the

television.  *Id.* (Loli Aff. ¶ 29).  There were also "posters of Houthi martyrs who had died in

combat plastered along the prison walls."  *Id.* (Loli Aff. ¶ 29).

   Loli's overall level of health and hygiene during the period that she was held was very

poor.  To use the bathroom, Loli had to wear a long black dress, "wrap [her] head with a

hijab . . . , and then knock twice on the door of [her] room and wait for female guards" to escort

her.  *Id.* at 8 (Loli Aff. ¶ 35).  As the period of her captivity prolonged, the female guards became

"visibly irritated whenever [she] knocked to use the backroom" and became increasingly unresponsive to her requests. *Id.* (Loli Aff. ¶ 36). When she was allowed to use the bathroom, the door to the bathroom was always left open. *Id.* (Loli Aff. ¶ 35). She initially was allowed to bathe once a week "using a bucket with about ten liters of water," but as time went on, she was allowed "to bathe and wash [her] clothes [only] every two weeks." *Id.* at 9 (Loli Aff. ¶ 40). Loli's access to food was restricted, and she lost over twenty pounds and developed intestinal pain as a result. *Id.* (Loli Aff. ¶¶ 44–46). She also developed a urinary tract infection and hemorrhoids, causing her significant pain and other digestive problems. *Id.* at 9–10 (Loli Aff. ¶ 41, 45–46).

During this time, Loli estimates that she was interrogated "between thirty and forty different times" for "about three or four hours each time." *Id.* at 11 (Loli Aff. ¶ 47). These interrogation sessions occurred "almost every night for the first several weeks" before becoming "spaced far in between before hitting a stretch of weeks without being interrogated." *Id.* (Loli Aff. ¶ 49). During interrogation, Loli was repeatedly questioned about her presence in Yemen, accused of "hiding [her] real purpose for being in the country," and accused of "working for the CIA and being associated with American personnel who worked at the U.S. embassy." *Id.* at 13 (Loli Aff. ¶ 58). Throughout her imprisonment, Loli was repeatedly threatened by the interrogators and the female guards. *See, e.g.*, *id.* at 15 (Loli Aff. ¶ 68).

In late October 2019, Loli was blindfolded, handcuffed, and taken to a room where an interrogator threatened to move her to another location where "they know how to get information from people" if she did not provide information other than that which she had already shared with him. *Id.* at 16 (Loli Aff. ¶¶ 70–71). Loli was told that this was her "last chance," and she was convinced that "[she] was going to be tortured or killed." *Id.* at 16–17 (Loli Aff. ¶¶ 72–73).

Shortly thereafter, Loli was transferred to a second prison which she was told was a "transit station" for those about to be released.  *Id.* at 17 (Loli Aff. ¶¶ 75–76).

At the second prison, Loli met with the "Head of Political Prisoners" who told her that she "may be released but it would take some time."  *Id.* at 18 (Loli Aff. ¶ 81).  A few days later, a nurse collected blood, urine, and stool samples from Loli.  *Id.* (Loli Aff. ¶ 82).  She was subsequently taken for more blood tests and an X-Ray.  *Id.* at 19 (Loli Aff. ¶ 87).  After Loli lost her appetite and began to lose weight, a doctor and the head of political prisoners "visited [her] to discuss her declining health" and "encouraged [her] to eat more and take care of [her]self."  *Id.* at 20 (Loli Aff. ¶ 93).  The head of political prisoners encouraged Loli to eat more, worrying "what would people say if they saw [Loli] like that when [she] was released."  *Id.* at 22 (Loli Aff. ¶ 99).  Shortly thereafter, new interrogators asked Loli to sign written documents indicating that she was in the military, but, citing their inaccuracies, Loli refused.  *Id.* (Loli Aff. ¶ 95).  Loli later signed corrected versions of these documents and, after being forced to recount her life story on video tape, was released and taken to the airport two days later on October 14, 2020.  *Id.* at 22 (Loli Aff. ¶¶ 100–02).

Loli suffered physical and psychological harm as a result of her imprisonment.  Results from a physical examination shortly after her release showed "abnormal weight loss, low body mass index, nutritional anemia, vitamin deficiency, paresthesia of the skin, pain in hip and low back, and acute post-traumatic stress disorder."  *Id.* at 23 (Loli Aff. ¶ 105).  She continues to suffer from post-traumatic stress disorder, chronic lower back pain, neuropathy in her feet, and generalized anxiety "which affects [her] heart rate and [her] digestive system."  *Id.* (Loli Aff. ¶¶ 103–04).

### III.  CONCLUSIONS OF LAW

Under the FSIA, 28 U.S.C. § 1604, a foreign state, including its instrumentalities, is immune from suit in state or federal court unless the case falls within an express statutory exemption.  *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004).  For present purposes, the sole relevant exception is found in the "state-sponsored terrorism exception," 28 U.S.C. § 1605A, which both confers subject-matter jurisdiction to hear certain terrorism-related claims under state or federal law and recognizes a federal cause of action against those foreign states subject to the exception, *see Owens*, 864 F.3d at 764–65.  The FSIA also addresses personal jurisdiction and specifies precise procedures that a plaintiff must follow—at times with the assistance of the Clerk of the Court and the U.S. Department of State—to effect service on a foreign state.  28 U.S.C. § 1608.

For different reasons, the Court must satisfy itself that an FSIA plaintiff has cleared each of these hurdles, even if the defendant fails to appear.  First, because the FSIA deprives courts of subject-matter jurisdiction in the absence of a relevant exception, a failure to appear does not waive the defense, and the courts are "obligated to consider *sua sponte*" whether they have jurisdiction to hear the case and to order any relief.  *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012); *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 n.20 (1983) (even where a defendant foreign state does not appear, the Court "still must determine that immunity is unavailable").  Second, with respect to the substance of the plaintiff's state or federal law claims, the FSIA precludes courts from entering a default judgment against a foreign state unless satisfied that the plaintiff has established her right to relief.  28 U.S.C. § 1608(e); *see also Owens*, 864 F.3d at 784–86.  Third, because "the entry of default judgment is not automatic,"

courts must "satisfy [themselves] that [they have] personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6.

Each of these inquiries implicates a slightly different standard of proof. To establish subject-matter jurisdiction, an FSIA "plaintiff bears [the] initial burden of production to show an exception to immunity, such as § 1605A, applies," but, if the plaintiff does so, and the defendant does not appear, "jurisdiction attaches." *Owens*, 864 F.3d at 784. Having cleared this initial hurdle, however, "the plaintiff must still prove [her] case on the merits." *Id.* To do so, the plaintiff must establish her right to relief, which does not "relieve[] the sovereign from the duty to defend" but, nonetheless, requires that the plaintiff offer admissible evidence sufficient to substantiate the essential elements of her claim. *Id.* at 786 (internal quotation marks and citation omitted). Finally, to establish personal jurisdiction over a defaulting defendant, the plaintiff must make "a prima facie showing of [personal] jurisdiction." *Mwani*, 417 F.3d at 6–7.

## A.    Subject-Matter Jurisdiction and Liability for § 1605A(c) Claims

Federal district courts "have original jurisdiction" over "any nonjury civil action against a foreign state" asserting "any claim for relief in personam with respect which the foreign state is not entitled to immunity" under the FSIA. 28 U.S.C. § 1330(a). The Court, accordingly, has subject-matter jurisdiction over the present "nonjury civil action" against Iran if, and only if, the conditions for the waiver of immunity found in 28 U.S.C. § 1605A are satisfied. As explained below, Plaintiffs have carried their burden of establishing the Court's subject-matter jurisdiction.

Under the state-sponsored terrorism exception, 28 U.S.C. § 1605A(a)(1), a foreign state is not immune from the jurisdiction of the federal and state courts in cases in which

> [1] money damages are sought against a foreign state [2] for personal injury or death [3] that was caused by [4] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is [5]

> engaged in by an official, employee, or agent of such foreign state while acting
> within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1). The exception, moreover, applies only to suits in which two

requirements are met. First, the claimant or victim must be a U.S. national, a member of the U.S.

armed forces, or a U.S. government employee or contractor at the time the act of terrorism

occurred. *Id.* § 1605A(a)(2). Second, the foreign state must be designated as a state sponsor of

terrorism both at the time the act occurred (or was so designated as a result of the act) and at the

time the lawsuit was filed (or was so designated within the six-month period preceding the filing

of the suit).[4] *Id.*

     Here, most of the conditions for subject-matter jurisdiction are easily addressed. First,

Plaintiffs seek only monetary relief. *See* Dkt. 1 at 21–22 (Compl.). Second, all of the claims

seek to recover "for personal injury." 28 U.S.C. § 1605A(a)(1); Dkt. 1 at 21–22 (Compl.).

Third, Iran was designated as a state sponsor of terrorism in 1984, *see* 49 Fed. Reg. 2836-02

(Jan. 23, 1983) (statement of Secretary of State George P. Shultz), and has remained designated

as a state sponsor of terrorism to this day, *see* U.S. Dep't of State, *State Sponsors of Terrorism*,

https://www.state.gov/j/ct/list/c14151.htm (last visited June 15, 2022). This longstanding

designation of Iran as a state sponsor of terrorism is sufficient to satisfy the designation

requirement. *See* 28 U.S.C. § 1605A(a)(2)(A)(i)(I). Fourth, at the time the relevant acts

occurred, Gidada and Loli were both U.S. nationals. Dkt. 17-2 at 1 (Gidada Aff. ¶ 2); Dkt. 17-3

at 1 (Loli Aff. ¶ 2).

---

[4] Section 1605A(a)(2) also requires that the foreign state have received "a reasonable opportunity
to arbitrate the claim," but only if the act of terrorism "occurred in the foreign state against which
the claim has been brought." 28 U.S.C. § 1605A(a)(2)(A)(iii). That requirement is inapplicable
to the facts of this case because none of the alleged acts of terrorism occurred in Iran.

As a result, the only substantial jurisdictional question left for the Court is whether Plaintiffs' injuries were "caused by . . . act[s] of torture, . . . hostage taking, or the provision of material support or resources for such an act" by an "official, employee, or agent of" Iran.  28 U.S.C. § 1605A(a)(1).  For the reasons explained below, the Court concludes as follows: (1) the Houthis committed acts of "hostage taking" within the meaning of the International Convention Against the Taking of Hostages; (2) Iranian officials or their agents provided "material support or resources" for these acts within the meaning of 18 U.S.C. § 2339A; and (3) Iran's provision of material support caused the injuries of Gidada and Loli, as well as the associated injuries suffered by their family members.  Plaintiffs, accordingly, have established that their claims fall within the state-sponsored terrorism exception of 28 U.S.C. § 1605A(a)(1).

    1.    *The Houthis' Acts of Hostage Taking*

The state-sponsored terrorism exception to the FSIA defines the terms "hostage taking," by reference to the Convention Against the Taking of Hostages, 1316 U.N.T.S. 205, and "torture" by reference to the Torture Victim Protection Act ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 (note)).  *See* 28 U.S.C. § 1605A(h)(2) & (7).  To support a finding of subject-matter jurisdiction, the Court need only find that one of the statutory acts was present as to each of the victims.  Dkt. 17-1 at 20–21; 28 U.S.C. § 1605A(a)(1); *see also Hamen*, 401 F. Supp. 3d at 101; *Coombs*, 2022 WL 715189, at \*16.  As discussed below, the Court concludes that Gidada and Loli were both victims of hostage taking within the meaning of the Convention Against the Taking of Hostages.  As a result, the Court need not reach the question whether Plaintiffs were also victims of torture.

The FSIA's definition of "hostage taking" is borrowed from Article 1 of the International Convention Against the Taking of Hostages. 28 U.S.C. § 1605A(h). Under that treaty, "hostage taking" means

> seiz[ing] or detain[ing] and threaten[ing] to kill, to injure or to continue to detain another person . . . in order to compel a third party, namely, a State, an international governmental organization, a natural or juridical person, or a group of persons, to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage. . . .

International Convention Against the Taking of Hostages, art. 1, Dec. 17, 1979, 1316 U.N.T.S. 205. Thus, to show that the hostage taker had the requisite purpose of detaining the individual, "the plaintiff must 'suggest[] [a] demand for *quid pro quo* terms between . . . [the hostage-taker] and a third party whereby [the hostages] would have been released.'" *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 360 (D.C. Cir. 2006) (first and second alterations in original).

          a.    The Hostage Taking of Mikael Gidada

The Court finds that the Houthis committed an act of "hostage taking" when they seized and detained Mikael Gidada.

Many aspects of Gidada's abduction, detention, and release fit with the expert testimony in the *Coombs* and *Hamen* cases concerning Houthi hostage taking techniques and share important similarities with the kidnapping of Loli. First, Gidada's interrogators "always wanted to know who [he] was and why [he] was in Yemen," and, more specifically, wanted him "to admit to being an American and Israeli spy." Dkt. 17-2 (Gidada Aff. ¶ 25). Loli, similarly was "accuse[d]" of "working for the CIA" and "being associated with American personnel who worked at the U.S embassy" during the interrogations that she endured. Dkt. 17-3 at 13 (Loli Aff. ¶ 58). Plaintiffs' expert opines that the Houthis were "ascertaining [Gidada and Loli's]

respective values as U.S. hostages" at the time.  Dkt. 17-4 at 6 (Pregent Aff. ¶ 23); *see also Coombs*, 2022 WL 715189, at *17 ("Plaintiffs submitted evidence that this kind of demand is 'common hostage protocol' for the Houthis because those admissions 'increase the value of [hostages] either to procure a ransom or to score a propaganda victory-and-ransom combination.'").

Second, as with several of the victims in the *Coombs* case, the Houthis' administration of medical care to Gidada demonstrates that Gidada had value to them alive; they took him to a hospital for surgery, for example, when he developed a dangerous hernia.  Dkt. 17-2 at 6 (Gidada Aff. ¶ 31); *see Coombs*, 2022 WL 715189, at *18.  Third, in keeping with Hezbollah's hostage-taking tactics, Gidada was a lower profile American, not a high ranking official or diplomat whose abduction might trigger a military response.  *See Hamen*, No. 16-cv-1394, Dkt. 49 at 16–17 (Pregent).  Fourth, when Gidada was eventually released, he was handed over to an Omani diplomatic delegation.  That release scenario fits a pattern applicable to all four victims in the *Coombs* case.  *See Coombs*, 2022 WL 715189, at *17.  Finally, Gidada's release came as part of a negotiated prisoner swap, in exchange for 238 Houthi soldiers (who were released "several hours before" Gidada's release), Dkt. 17-2 at 7 (Gidada Aff. ¶ 37)—a *quid pro quo* exchange that fits squarely under the meaning of "hostage taking" as defined by the International Convention Against the Taking of Hostages.

Based on this evidence, the Court finds that the Houthis committed "hostage taking" within the meaning of the International Convention Against the Taking of Hostages with respect to Mikael Gidada.

b.    The Hostage Taking of Sandra Loli

For many of the same reasons, the Court finds that the Houthis committed an act of "hostage taking" when they abducted and detained Sandra Loli.  First, the evidence suggests that Loli was targeted because of her U.S. citizenship—the Houthis who stopped Loli at a checkpoint, after inspecting her visa and travel documents, insisted that it was "very dangerous for [her] as an American" to drive to Aden because of "ISIS militants' control" of the area, and forced her to watch a video purporting to show ISIS militants executing several men.  Dkt. 17-3 at 4 (Loli Aff. ¶ 17).  Indeed, Plaintiffs' expert states that "[b]ased on the details of her capture, it is [his] professional opinion that Ms. Loli was taken hostage solely because she was an American."  Dkt. 17-4 at 6 (Pregent Aff. ¶ 25).  Second, like Gidada, Loli was repeatedly interrogated by her Houthi captors and accused of "working for the CIA and being associated with American personnel who worked at the U.S. embassy."  Dkt. 17-3 at 13 (Loli Aff. ¶ 58); *see* Dkt. 17-4 at 6 (Pregent Aff. ¶¶ 25–26) (opining that it is "common hostage protocol for the Houthis to try to coerce captives to admit that they are part of a foreign intelligence service like the CIA").

Third, also like Gidada, the Houthis' administration of medical care to Loli demonstrates that Loli had value to them alive; for example, they provided her with leafy greens and olive oil when she developed severe pain due to constipation and, after she met with the "Head of Political Prisoners," a nurse took a blood, urine, and stool samples.  Dkt. 17-3 at 9, 18, 20–22 (Loli Aff. ¶¶ 42, 81–82, 93, 99).  Subsequently, the Houthis took Loli for blood tests and for an X-ray of her back and pleaded with her to eat more—and the Head of Political Prisoners expressed concern about "what people would say if they saw [her] like that when [she] was released."  *Id.* at 19, 21–22 (Loli Aff. ¶¶ 87, 99).  Furthermore, as a businesswoman, Loli fit the

28

Hezbollah-backed tactic of abducting lower-profile Americans. *See* Dkt. 17-4 at 7 (Pregent Aff. ¶ 27) ("[Houthis] focus[] on choosing targets that have maximum value to their captors, but without attracting the full force of a military response. These kidnappings fit squarely within that mold."); *see also Hamen*, No. 16-cv-1394, Dkt. 49 at 16–17 (Pregent).

In short, the abduction and detention of Loli fits a familiar pattern, as described above and in *Coombs* and *Hamen*. As Plaintiffs' expert states the "details" of Loli's experience support his "professional opinion that Loli's suffering took place in the custody of an [Iranian] proxy that was ascertaining [her] . . . value[] as [a] U.S. hostage[]." Dkt. 17-4 at 6 (Pregent Aff. ¶ 23). The Court, accordingly, finds that the Houthis committed "hostage taking" within the meaning of the International Convention Against the Taking of Hostages with respect to Sandra Loli.

### 2. *Iran's Provision of Material Support for the Houthis' Acts of Hostage Taking*

The Court further finds that Iran provided the Houthis with material support for the acts described above. The FSIA's definition of "material support or resources" is borrowed from 18 U.S.C. § 2339A, which defines "material support or resources" in relevant part as

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . , and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1). The evidence set forth above demonstrates that Iran provided "material support or resources" to the Houthi militants in the form of weapons, financial support, and training, both directly and indirectly through Hezbollah. *See generally supra* Part II.A.3. The *Hamen* record contains a litany of evidence that Iran provided the Houthis with weaponry since at least 2009. *Coombs*, No. 19-cv-3363, Dkt. 20-5 at 4 (Pregent Aff. ¶ 15); *Hamen*, No. 16-cv-1394, Dkt. 49 at 63–66 (Green); *id.* at 10–14 (Pregent). That evidence also shows that

Iran provided financial assistance to the Houthis through Hezbollah. *Coombs*, No. 19-cv-3363, Dkt. 20-5 at 4 (Pregent Aff. ¶ 15); *Hamen*, No. 16-cv-1394, Dkt. 48 at 187–91 (Pregent); *id.*, Ex. 11 at 1. And, finally, Iran assigned a Qods Force officer as the leader of its efforts to "advise, assist, resource, and train the Houthis," *Hamen*, No. 16-cv-1394, Dkt. 32-4 at 8 (Green Aff. ¶ 32); *Hamen*, No. 16-cv-1394, Dkt. 49 at 53, 64, 96 (Green); *see also Coombs*, No. 19-cv-3363, Dkt. 20-5 at 4 (Pregent Aff. ¶ 19), and facilitated the Houthis' training with Hezbollah's Unit 3800 in Yemen, Lebanon, Syria, and Iraq, *Hamen*, No. 16-cv-1394, Dkt. 49 at 96 (Green); *Hamen*, No. 16-cv-1394, Dkt. 48 at 191 (Pregent); *see also Coombs*, No. 19-cv-3363, Dkt. 20-5 at 4 (Pregent Aff. ¶ 19).

Record evidence also shows that, without Iranian financial, military, and political support, the Houthis would not have been able to exert power or control outside of their home province of Saada; would not have been able to seize or maintain control of the capital city of Sana'a; and, most importantly, would not have developed and implemented the tactic of taking foreign nationals hostage. *Coombs*, No. 19-cv-3363, Dkt. 20-5 at 4, 7–8 (Compl. ¶¶ 15, 19, 29, 30, 33); *Hamen*, No. 16-cv-1394, Dkt. 49 at 112 (Green); *Hamen*, No. 16-cv-1394, Dkt. 49 at 20–22 (Pregent). Even more to the point, the record shows that, without Iran's backing, the Houthis would not have attempted to kidnap an American, nor would they have been able to do so without Iran's support. *Hamen*, No. 16-cv-1394, Dkt. 49 at 16–17 (Pregent); *Hamen*, No. 16-cv-1394, Dkt. 49 at 69 (Green).

3.     *Causation*

The only remaining requirement for finding a waiver of sovereign immunity under § 1605A is a showing that the injuries were "caused by" Iran's provision of material support to the Houthis. 28 U.S.C. § 1605A(a)(1). The D.C. Circuit has held that this statutory language,

like the similar language that previously appeared in 28 U.S.C. § 1605(a)(7) (repealed), "requires a causal connection" as a jurisdictional prerequisite to suit. *Kilburn*, 276 F.3d at 1127. The court of appeals has rejected the contention that the plaintiff need establish "but for" causation, however, and has held that the statute "require[s] only a showing of 'proximate cause.'" *Id.* at 1128. An FSIA plaintiff, accordingly, need not show that the defendant state "specifically knew of or intended its support to cause" a *particular* terrorist act. *Owens*, 864 F.3d at 798.

Under long-established law, proximate cause requires "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Kilburn*, 376 F.3d at 1128 (quoting Prosser & Keeton on the Law of Torts 263 (5th ed. 1984)). The proximate cause inquiry "contains two similar but distinct elements." *Id.* First, Plaintiffs must show that Iran's provision of support to the Houthis was "a 'substantial factor' in the sequence of events that led to the" hostage takings of Gidada and Loli. *Id.* (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)). Second, Plaintiffs must establish that the kidnappings were "'reasonably foreseeable or anticipated as a natural consequence' of [Iran's] conduct." *Id.* (quoting *Rothstein*, 708 F.3d at 91).

The Court finds that there is sufficient evidence in the record to satisfy this standard. The support that Iran provided to the Houthis was not only a "substantial factor" but a necessary precondition to the Houthis taking Gidada and Loli hostage. Without Iran's support, the Houthis would not have had control in early 2015 of Sana'a, *Coombs*, No. 19-cv-3363, Dkt. 20-5 at 7 (Pregent Aff. ¶¶ 30, 31); *Hamen*, No. 16-cv-1394, Dkt. 49 at 53–54, 112 (Green); *Hamen*, No. 16-cv-1394, Dkt. 49 at 20–22 (Pregent), where Gidada and Loli were kidnapped and detained, Dkt. 17-2 at 4 (Gidada Aff. ¶¶ 16–19); Dkt. 17-3 at 3–4, 6 (Loli Aff. ¶¶ 13–15, 24–25). Prior to receiving Iran's support the Houthis were "localized" to their home province and would not have

had the resources to seize Sana'a. *Hamen*, No. 16-cv-1394, Dkt. 49 at 44 (Green). Iran's support, accordingly, put the Houthis in a position of power to commit acts of terrorism like the ones at issue in this case.

Beyond increasing the Houthis' influence in Yemen, Iran also provided the training and political backing necessary to enable and to embolden the Houthis to target and to kidnap Americans and to negotiate for their release. The record indicates that the Qods Force, either directly or through Hezbollah, "exports" to its proxies a "collection of behaviors, tactics, and capabilities," *Hamen*, No. 16-cv-1394, Dkt. 49 at 111 (Green), which includes training in "targeted hostage taking[] and kidnapping[]," *Coombs*, No. 19-cv-3363, Dkt. 20-5 at 4 (Pregent Aff. ¶ 17); *see also Hamen*, No. 16-cv-1394, Dkt. 48 at 182–83 (Pregent), and, in particular, the "taking of international hostages," *id.*, Dkt. 49 at 107 (Green); *see also Coombs*, No. 19-cv-3363, Dkt. 20-5 at 4 (Pregent Aff. ¶¶ 17, 18). There is also evidence that the Houthis have adopted the full range of those tactics, *see Hamen*, No. 16-cv-1394, Dkt. 49 at 96–107 (Green), including abducting 982 people for ransom and engaging in 796 documented cases of torture between September 2014 and August 2015 alone, *id.* at 101 (Green); *Hamen*, No. 16-cv-1394, Ex. 39 at 4–5, 16. Today, the Houthis are ranked as the third leading hostage takers among the world's non-state actors. Dkt. 17-4 at 5 (Pregent Aff. ¶ 19). Plaintiffs' expert has attested, moreover, that the "manner in which the victims in this case were detained, treated, and interrogated is consistent with the training and direction that the Houthis received from Hezbollah and the [Qods Force]." *Id.* at 7 (Pregent Aff. ¶ 33).

In addition to training, Iran has provided the political backing and tactical support necessary for the Houthis to execute a high-stakes abduction of Americans. The experts in *Hamen* testified that, due to the risk and complexity of kidnapping Americans and bargaining for

their release, the Houthis would not have attempted to do so without the support of Iran, *Hamen*,

No. 16-cv-1394, Dkt. 49 at 69 (Green); *id.* at 16–17, 21–22 (Pregent), and that Iran would have

been made aware of any hostage-taking the Houthis carried out, *id.* at 21–22 (Pregent).  Even

more to the point, the record indicates that the Qods Force encourages its proxies to kidnap

Americans by providing "kidnapping incentives" in the form of a "bounty or reward for . . . high

value targets."  *Hamen*, No. 16-cv-1394, Dkt. 48 at 191–92 (Pregent); *Hamen*, No. 16-cv-1394,

Dkt. 49 at 22 (Pregent).  And, from Iran's perspective, the "highest value target [a proxy] can

kidnap would be an American."  *Hamen*, No. 16-cv-1394, Dkt. 48 at 192 (Pregent).

The Court finds, accordingly, that Iran's support was a "substantial factor" in the hostage

takings of Gidada and Loli.

For similar reasons, the hostage takings of Gidada and Loli were "'reasonably

foreseeable or anticipated as a natural consequence' of [Iran's] material support."  *Owens*, 864

F.3d at 798 (quoting *Rothstein*, 708 F.3d at 91).  In assessing reasonable foreseeability, the Court

must consider "the broader context" of Iran's conduct.  *Id.*  In this respect, it is clear that Iran's

assistance made it possible for the Houthis—a militant group that chants "Death to America" and

has a history of kidnapping local dissenters and holding them for ransom—to become a regional

power and to assume a position of control where it could execute abductions of U.S. citizens.  In

the years preceding the abductions of Gidada and Loli, moreover, Iran provided training (either

directly or through Hezbollah), which included training in "targeted hostage taking[] and

kidnapping[]," *Coombs*, No. 19-cv-3363, Dkt. 20-5 at 4 (Pregent Aff. ¶ 17); *see also Hamen*, No.

16-cv-1394, Dkt. 48 at 182–83 (Pregent), and, in particular, the "taking of international

hostages," *Hamen*, No. 16-cv-1394, Dkt. 49 at 107 (Green); *see also Coombs*, No. 19-cv-3363,

Dkt. 20-5 at 4 (Pregent Aff. ¶¶ 17, 18).  Iran also encourages its proxies to kidnap Americans.

*Hamen*, No. 16-cv-1394, Dkt. 48 at 191–92 (Pregent); *Hamen*, No. 16-cv-1394, Dkt. 49 at 22

(Pregent).  That one of Iran's proxies acted to abduct and detain Americans is not only a

reasonably foreseeable natural consequence, but a desired result of Iran's training and directives.

Finally, although specific intent is not required to establish causation, *Owens*, 864 F.3d at 798,

the evidence submitted in *Hamen* and *Coombs* is sufficient to establish that, even if Iran had not

been involved at "the hour of the kidnapping," it would have been notified once the victims were

in the custody of the Houthis, and the Houthis could not have "h[e]ld Americans without the

IRGC-Qods Force allowing it" to do so.  *Hamen*, No. 16-cv-1394, Dkt. 49 at 20–22 (Pregent);

*see also id.* at 69 (Green).  Indeed, the expert testimony in *Hamen* indicated that, if the Qods

Force did not support a kidnapping, "they would have pressured the Houthis to release [the

captured Americans] that day."  *Hamen*, No. 16-cv-1394, Dkt. 49 at 20–22 (Pregent).

Having found that Iran provided material support for the Houthis and that this support

"caused" the hostage taking of Gidada and Loli, the Court finds that this case falls squarely

within the state-sponsored terrorism exception to the FSIA.[5]  *See* 28 U.S.C. § 1605A(a)(1).  As a

result, the Islamic Republic of Iran is not entitled to the protection of foreign sovereign

immunity, and the Court possesses subject-matter jurisdiction over Plaintiffs' claims.  *See* 28

U.S.C. §§ 1330(a), 1605A(a)(1).

4.    *Federal Cause of Action*

Having concluded that the Court possesses subject-matter jurisdiction, little else is

required to show that Plaintiffs are entitled to relief under the federal cause of action the

---

[5] The fact that most of the Plaintiffs in this case are "third-party claimant[s]" rather than "the legal representative[s] of [the] victim[s] [who were] physically injured" does not divest this Court of subject-matter jurisdiction.  *Owens*, 864 F.3d at 807.  "Who in particular may bring a claim against a foreign sovereign is a question of substantive law, wholly separate from the question of [federal courts'] jurisdiction."  *Id.*

Congress enacted in 2008 as part of the National Defense Authorization Act, Pub. L. No. 110-181, § 1083, 122 Stat. 338–44 (2008) (codified at 28 U.S.C. § 1605A(c)).  There is almost total "overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017), and a plaintiff who offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law—with one minor exception.  For the "personal injury or death caused by" any of the acts described in the state-sponsor of terror waiver of foreign sovereign immunity and over "which the courts of the United States may maintain jurisdiction under [§ 1605A] for money damages," 28 U.S.C. § 1605A(c), a foreign state designated as a sponsor of terrorism is liable only to "a national of the United States," "a member of the armed forces," "an employee [or contractor] of the [U.S.] Government . . . acting within the scope of the employee's employment," or "the legal representative of" any such person.  *Id.*  Because Plaintiffs are all U.S. nationals,[6] Plaintiffs have, for the reasons described above, carried their burden of demonstrating that they are entitled to relief under § 1605A(c).

## B.    Personal Jurisdiction

The Court also finds that it has personal jurisdiction over the Islamic Republic of Iran for the purposes of Plaintiffs' claims.  Under the FSIA, the Court has personal jurisdiction over a foreign state "as to every claim for relief over which the [Court] ha[s] jurisdiction . . . where service has been made under section 1608."  28 U.S.C. § 1330(b).  Thus, "[i]n order to sue a

---

[6] *See* Dkt. 17-2 (Gidada Aff. ¶¶ 2–3); Dkt. 17-3 (Loli Aff. ¶¶ 2–3); Dkt. 18-1 at 1 (Juanita Gidada Aff. ¶ 2); Dkt. 18-2 at 1 (Ayane Gidada Aff. ¶ 2); Dkt. 18-3 at 1 (David Gidada Aff. ¶ 2); Dkt. 18-4 at 1 (John Gidada Aff. ¶ 2); Dkt. 18-5 at 1 (Lilu Gidada Aff. ¶ 2); Dkt. 18-6 at 1 (Richard Alan Boni Aff. ¶ 2); Dkt. 18-7 at 1 (Richard Abdullah Boni Aff. ¶ 2); Dkt. 18-8 at 1 (Mitchell Aff. ¶ 2); Dkt. 18-9 at 1 (Anderson Aff. ¶ 2).

foreign state or one of its political subdivisions, a plaintiff must effect service in compliance

with" 28 U.S.C. § 1608(a).  *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C.

Cir. 2015).

> Section 1608(a) sets forth four methods of service in descending order of preference:
>
> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
>
> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
>
> (3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned; or
>
> (4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a).

The first two mechanisms of effecting service—by delivery of the summons and

complaint either "in accordance with any special arrangement for service between the plaintiff

and the foreign state" under § 1608(a)(1) or "in accordance with an applicable international

convention on service of judicial documents" under § 1608(a)(2)—were unavailable to Plaintiffs

in this case.  No "special arrangement" governs service between Plaintiffs and Iran, and "Iran is

not party to an 'international convention on service of judicial documents.'" *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008) (internal citations omitted).

As a result, Plaintiffs attempted service under the third alternative, which requires service by mail from the Clerk of the Court to the head of the ministry of foreign affairs of the foreign state. 28 U.S.C. § 1608(a)(3). On January 14, 2022, Plaintiffs initiated service to Iran under § 1608(a)(3). Dkt. 7. The Clerk of Court mailed the relevant documents to Iran on March 1, 2022. Dkt. 12. On February 25, 2022, Plaintiffs notified the Court that "thirty days ha[d] passed and the materials ha[d] not been delivered." Dkt. 10 at 1; see 28 U.S.C. § 1608(a)(4).

Finally, Plaintiffs served Defendants under § 1608(a)(4). Dkt. 12. That provision requires service by mail from the Clerk of Court to the Secretary of State, who must then transmit the required material through diplomatic channels to the foreign state. 28 U.S.C. § 1608(a)(4). The Department of State must then send "the Clerk of the Court a certified copy of the diplomatic note indicating when the papers were transmitted." *Id.* Plaintiffs provided the Clerk with the relevant documents and requested service pursuant to § 1608(a)(4) on February 25, 2022. Dkt. 10. The Clerk mailed these materials to the State Department on March 1, 2022. Dkt. 12. On August 11, 2022, the Department of State notified the Clerk that the documents had been served on Iran. Dkt. 13. Because the United States does not maintain diplomatic relations with the government of Iran, the documents were transmitted to the Embassy of Switzerland in Iran, which then transmitted the materials to the Iranian Ministry of Foreign Affairs on June 15, 2022. Dkt. 13 at 1, 4. After the Islamic Republic of Iran failed to respond, the Clerk entered a default. Dkt. 15.

Plaintiffs' efforts to serve Iran satisfied the requirements of § 1608(a)(4).  Because

Plaintiffs accomplished service under 28 U.S.C. § 1608(a)(4) on the Islamic Republic of Iran, the

Court possesses personal jurisdiction over Defendant.  *See* 28 U.S.C. § 1330(b).

Accordingly, Plaintiffs have established their right to relief under 28 U.S.C. § 1605A(c).

## CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS** Plaintiffs' motion for default

judgment, Dkt. 17.

**SO ORDERED**.


 /s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  June 27, 2024